THE STATE OF OHIO, APPELLEE, *v.* LANG, APPELLANT.

[Cite as *State v. Lang,* 129 Ohio St.3d 512, 2011-Ohio-4215.]

*Criminal law—Aggravated murder—Death penalty upheld.*

(No. 2007-1741—Submitted June 7, 2011—Decided August 31, 2011.)

APPEAL from the Court of Common Pleas of Stark County,

No. 2006-CR-1824A.

_____

O'DONNELL, J.

{¶ 1} This is an appeal as of right by defendant-appellant, Edward Lang. A jury convicted him of the aggravated murder of Marnell Cheek and Jaron Burditte and of aggravated robbery, with each count carrying gun specifications, and it recommended the sentence of death for the aggravated murder of Cheek and life with no possibility of parole for the murder of Burditte. The trial court accepted those recommendations and sentenced Lang accordingly. The court also imposed a ten-year term of imprisonment for the aggravated-robbery conviction and a three-year term for the gun specifications, which it had merged for sentencing.

{¶ 2} We affirm Lang's convictions and sentences of death and life without parole, but we remand for the proper imposition of postrelease control pursuant to R.C. 2929.191 on his sentence for aggravated robbery.

### State's Case

{¶ 3} The state's case revealed that at 9:36 p.m. on October 22, 2006, Canton police officer Jesse Butterworth was dispatched to a traffic accident with injuries on Sahara Avenue in Canton. At the scene, Butterworth observed that a Dodge Durango had crashed into the back of a parked car. He discovered that the two people inside the Durango had been shot in the back of the head. They were later identified as Jaron Burditte, the driver, and Marnell Cheek, the front-seat passenger.

**{¶ 4}** Police investigators found a bag of cocaine in Burditte's hand. Investigators examining the inside of the Durango recovered two shell casings in the backseat area and a spent bullet in the driver's side door pocket. Additionally, two cell phones were found in the car, and a third cell phone was found in Burditte's pocket.

**{¶ 5}** One of the cell phones recovered from the Durango showed that calls had been received at 9:13 p.m. and 9:33 p.m., which was close to the time of the murders. Police learned that these calls had been made from a prepaid cell phone that was not registered in anyone's name. Phone records for the cell phone showed that two calls had been made to the phone number of Teddy Seery on the afternoon and evening of the murders.

**{¶ 6}** On October 24, 2006, Sergeants John Gabbart and Mark Kandel interviewed Seery. Following that interview, the police identified Lang as a suspect in the murders.

**{¶ 7}** At trial, Seery testified that he and Lang were together almost every day during the summer of 2006. Lang called Seery on the evening of October 22, but Seery did not recall what they discussed. On the morning of October 23, Seery was informed by another friend that someone had been murdered on Sahara Avenue. Lang came to Seery's house later that day.

**{¶ 8}** During the visit, Seery asked Lang "what happened at Sahara," because Lang stayed in that area. Lang told Seery that "he killed two people up there" that "[t]hey were going to rob." Lang then described what had occurred: "[H]e had called the guy up and the guy came and he saw there was a girl in the car. The guy passed him up. He called him back. The guy came back around, and he got in the car." Lang then said that he had gotten into the car and had "shot them * * * [t]wice." However, Lang did not tell Seery whom he was with or explain why he had shot the two people.

**{¶ 9}** The police obtained a warrant for Lang's arrest. On the evening of October 24, 2006, the police stopped Lang as he was parking his girlfriend's car at a local apartment. Lang gave police a false name when asked his identity, but police established his identity and arrested him. Police officers seized a 9 mm handgun and ammunition that had been wrapped inside a towel and were resting on the rear passenger floorboard of the car.

**{¶ 10}** On October 25, 2006, Sergeants Gabbart and Kandel interviewed Lang. After waiving his *Miranda* rights, Lang told police that on October 22, Antonio Walker had come to his house and had told him "he had somebody that [they] could rob." Lang agreed to join him. After Walker gave him Burditte's phone number, Lang called Burditte and made arrangements to purchase a quarter-ounce of crack cocaine for $225. Burditte and Lang agreed to meet later that night "off of 30th Street and Sahara," and Burditte said he would call Lang when he got close to that location.

**{¶ 11}** Lang stated that he gave his gun to Walker before they left the house because Walker had told him, "[A]ll [Lang] had to do was just be in the car with him basically." As they walked to the meeting location, Walker told Lang how the robbery was going to take place: Walker said they were going to get in the car and hold Burditte up, and he told Lang which direction to run afterwards.

**{¶ 12}** After reaching the meeting location, Burditte called Lang and told him that he was "right around the corner." After Burditte drove past them, Lang said that Walker had called Burditte on Lang's cell phone and told him where they were. The car then pulled up in front of Lang and Walker. Lang then described what happened: "I walked like on the other side of the car [and] I get in the back seat behind the passenger and he got in the back seat behind the driver. * * * We jumped in the car and he put the gun up dude head [sic] and told dude that he wanted everything and like in a moment of seconds he fired two shots. And I jumped out the car."

{¶ 13} Lang stated that they went to Walker's apartment after the shootings. Lang asked Walker why he shot the two people, and Walker said that "he felt as though dude was reachin' for somethin'. * * * And he wasn't * * * sure." Lang stated that he vomited in a bag. Lang also called "[his] home boy E" to get the gun melted down and disposed of. In the meantime, Walker wiped down the gun. Walker also told Lang that they needed to get rid of the cell phone, and Lang gave it to him. Walker then dismantled the phone and went outside to throw it in the dumpster.

{¶ 14} During the interview, Lang told police that he was surprised that Walker had shot the victims because the "plan was just to rob him." Lang also said, "I did not wanna do it. * * * He wanted to do it. * * * I just went with him for, that was my gun I needed some money."

{¶ 15} On October 26, 2006, Walker turned himself in to the police after learning that the police were looking for him. Walker then talked to the police about the murders.

{¶ 16} At trial, Walker testified that on the evening of October 22, 2006, he, Lang, and Tamia Horton, a girlfriend of Lang, were at Horton's apartment. Lang had a gun out and said that he "needed to hit a lick" (commit a robbery) because he "needed some money." Lang mentioned that they could rob "Clyde," who was Jaron Burditte. Walker knew Burditte because they had been in the same halfway house together in 2004.

{¶ 17} Walker agreed to help Lang rob Burditte because he was also "short on money." Their plan was to arrange to buy drugs from Burditte and then rob him when he showed up for the sale. Lang then called Burditte and arranged to buy a quarter ounce of crack cocaine from him later that night.

{¶ 18} Shortly thereafter, Lang and Walker walked to their meeting location on Sahara Avenue. Lang loaded his 9 mm handgun while they waited for Burditte to arrive. When Burditte's Durango drove past them, Lang called

Burditte and told him where they were.  Burditte then arrived at their location and stopped in front of Lang and Walker.

{¶ 19} According to Walker, Lang got into the backseat on the driver's side of the Durango.  Walker did not get into the Durango, explaining, "It didn't feel right to me."  Walker then heard two gunshots and saw Lang get out of the vehicle and start running.  Walker saw the Durango "crash[ ] up into the yard."

{¶ 20} Lang and Walker separately ran to Horton's apartment.  Lang vomited in the bathroom.  Walker asked whether Lang was all right, and Lang said, "[E]very time I do this, this same thing happens."  Walker testified that he never saw Lang's handgun after they reached his apartment.  He also denied throwing away Lang's cell phone.

{¶ 21} Michael Short, a criminalist with the Canton–Stark County crime lab, testified that none of the fingerprints collected matched Lang's or Walker's.  Short also examined the handgun seized from Lang's vehicle and the spent bullet recovered from the Durango.  He testified that testing showed that the handgun had fired the spent bullet.  Testing also showed that the two cartridge cases found in the Durango's backseat had been ejected by this handgun.

{¶ 22} Michele Foster, a criminalist with the Canton–Stark County crime lab, examined Lang's clothing.  Blood was found on Lang's red T-shirt and pants, but DNA testing showed that it was Lang's blood.  No blood was found on Lang's coat, knit hat, white T-shirt, or the athletic shoes that were taken from the car.  Soiling was also noticed on Lang's athletic shoes, jacket, and pants.

{¶ 23} Foster also examined Walker's clothing.  She found no blood on the hooded sweatshirt or the athletic shoes that Walker said he was wearing on October 22.  But tan-colored soiling with fragments of dried plant material was noticed on the exterior of both his shoes.

{¶ 24} Foster conducted DNA testing of a swab taken from the trigger grips, slide, and magazine release on the 9 mm handgun.  Foster detected low

levels of DNA from at least two individuals on the swab. Foster testified, "Walker is not the major source of DNA that we detected from the swabbing of the pistol." She also testified, "[W]e can say that Edward Lang cannot be excluded as a possible minor source to the DNA that we found on the weapon."[1] Because of the low level of DNA, Foster testified, "We can't say to a reasonable degree of scientific certainty that this person is the source. In this particular case, the chance of finding the major DNA profile that we found on that pistol is 1 in 3,461," which is to say that "1 of 3,461 people could possibly be included as a potential source of the DNA."

{¶ 25} Dr. P.S.S. Murthy, the Stark County coroner, conducted the autopsies on Cheek and Burditte. Murthy testified that Cheek was shot at close range above the left ear. The gunshot traveled "left to right, downwards, and slightly backwards" and exited behind Cheek's right ear. Cheek's toxicology report was negative for the presence of any drugs or alcohol.

{¶ 26} Dr. Murthy testified that Burditte was shot in the back of the head. The trajectory of the shot was downward, and the bullet exited through the left side of the victim's mouth. Dr. Murthy determined that the gunshot was a "near contact entrance wound" to the head. Burditte's toxicology report was positive for benzoylecognine, which is the metabolite for cocaine, and THCA, which is marijuana. Dr. Murthy concluded that a gunshot wound to the head was the cause of death for both victims.

{¶ 27} The defense presented no evidence during the guilt phase.

### Case History

---

1. Foster may have misspoken in stating that Lang cannot be excluded as a "possible minor source" of the DNA. It appears from Foster's other testimony that she meant to say that Lang could not be excluded as a possible "major" rather than "minor" source of DNA found on the handgun. This matter is addressed more fully in proposition V.

{¶ 28} Lang was indicted on two counts of aggravated murder pursuant to R.C. 2903.01(B). Count One charged Lang with the aggravated murder of Burditte while committing or attempting to commit aggravated robbery and/or aiding another in so doing. Count Two charged Lang with the aggravated murder of Cheek while committing or attempting to commit aggravated robbery and/or aiding another in so doing.

{¶ 29} Counts One and Two included death-penalty specifications for a course of conduct, R.C. 2929.04(A)(5), and for committing or attempting to commit aggravated robbery as the principal offender in the commission of the aggravated murder or, if not the principal offender, committing the aggravated murder with prior calculation and design, R.C. 2929.04(A)(7). Both counts also included gun specifications.

{¶ 30} Count Three charged Lang with aggravated robbery. This charge also included a gun specification.

{¶ 31} Lang pleaded not guilty to all charges. However, the jury found him guilty of the aggravated murders of Cheek and Burditte and of aggravated robbery, along with the associated gun specifications. The jury's verdict included findings that Lang was guilty as the principal offender (the actual shooter) of the two victims. Lang was sentenced to death for the murder of Cheek, to life without parole for the murder of Burditte, and to ten years in prison on the aggravated-robbery count. The court merged the gun specifications, for which it imposed an additional three-year term of imprisonment. Lang seeks reversal of his convictions and sentence in 22 propositions of law.

### Pretrial and Trial Issues

{¶ 32} *Sufficiency of the indictment.* In proposition of law III, Lang argues that his indictment for aggravated robbery in Count Three is constitutionally defective because it fails to specify the mens rea element of the offense. Lang argues that the defective charge also affects Counts One and Two

because aggravated robbery was the predicate felony for both aggravated-murder charges. He also argues that the death-penalty specifications for felony murder under R.C. 2929.04(A)(7) are defective because the predicate felony was aggravated robbery.

{¶ 33} We have considered similar arguments in prior cases. Lang's proposition of law is not well taken.

{¶ 34} Count Three of the indictment, the aggravated-robbery charge, followed the wording of R.C. 2911.01(A)(1). The indictment alleged that Lang "did, in attempting or committing a theft offense, as defined in Section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, have a deadly weapon on or about his person or under his control, to-wit: a Firearm, and did either display the weapon, brandish it, indicate that he possessed it, or used said weapon, and/or did aid or abet another in so doing, in violation of Section 2911.01(A)(1) of the Ohio Revised Code." Lang did not object to the indictment at trial.

{¶ 35} Lang invokes *State v. Colon*, 118 Ohio St.3d 26, 2008-Ohio-1624, 885 N.E.2d 917 ("*Colon I*"), in arguing that the indictment's failure to allege the mens rea for the offense of aggravated robbery constitutes structural error. In *Colon I*, this court held that the omission of a mens rea allegation in the indictment was a structural defect that rendered the conviction improper. Id. at ¶ 19. Further, we held that the issue could be raised for the first time on appeal. Id. However, in *State v. Colon*, 119 Ohio St.3d 204, 2008-Ohio-3749, 893 N.E.2d 169 ("*Colon II*"), this court clarified that when a defendant fails to preserve objections to a defective indictment during the course of a trial, the issues are generally forfeited and must be reviewed under a plain-error analysis except in rare cases of structural error. Id. at ¶ 7.

{¶ 36} In *State v. Horner*, 126 Ohio St.3d 466, 2010-Ohio-3830, 935 N.E.2d 26, this court overruled *Colon I* and *Colon II* to the extent that they held

that such indictments are defective. Id. at ¶ 45. *Horner* holds, "An indictment that charges an offense by tracking the language of the criminal statute is not defective for failure to identify a culpable mental state when the statute itself fails to specify a mental state." Id. at paragraph one of the syllabus. *Horner* also holds that a defendant's failure to make a timely objection to a defect in an indictment constitutes waiver of all but plain error. Id. at paragraph three of the syllabus.

{¶ 37} Based on *Horner*, the failure to include a mens rea element in Lang's indictment for aggravated robbery did not constitute plain error, because the indictment tracked the language of R.C. 2911.01(A)(1). For the same reasons, we reject Lang's argument that the aggravated felony-murder charges and the R.C. 2929.04(A)(7) specifications must be dismissed.

{¶ 38} Based on the foregoing, we overrule proposition III.

{¶ 39} *Disclosure of grand jury testimony*. In proposition of law VI, Lang argues that the trial court erred by denying his request for grand jury testimony.

{¶ 40} Lang made various pretrial motions requesting the names of the witnesses who testified before the grand jury and the transcripts of the grand jury testimony. The trial court ruled that the defense had failed to provide "any particularized need" for the transcripts and denied the request. The trial court also denied the defense motion to disclose the names of the grand jury witnesses. In a subsequent judgment entry, the trial court stated that it had reviewed the grand jury transcripts, which included the testimony of four witnesses, and determined that "the defendant has not provided a particularized need for the transcripts" and has "not met the burden to establish the disclosure" of them. The trial court also found that "no exculpatory or other information which must be disclosed to the defendant exists within said transcripts." The transcripts were sealed and made part of the appellate record.

{¶ 41} We have recognized a limited exception to the general rule of grand jury secrecy: an accused is not entitled to review the transcript of grand

jury proceedings "unless the ends of justice require it and there is a showing by the defense that a particularized need for disclosure exists which outweighs the need for secrecy." *State v. Greer* (1981), 66 Ohio St.2d 139, 20 O.O.3d 157, 420 N.E.2d 982, paragraph two of the syllabus. A particularized need is established "when the circumstances reveal a probability that the failure to provide the grand jury testimony will deny the defendant a fair trial." *State v. Sellards* (1985), 17 Ohio St.3d 169, 173, 17 OBR 410, 478 N.E.2d 781. Determining whether a particularized need exists is a matter within the trial court's discretion. *Greer*, paragraph one of the syllabus.

{¶ 42} Lang argues that the trial court erred by failing to disclose the grand jury testimony of his codefendant, Walker. But review of the grand jury testimony shows that Walker never testified before the grand jury. Thus, this claim lacks merit.

{¶ 43} Lang also makes a generalized argument that he needed the grand jury testimony to prepare for cross-examination of the witnesses and to adequately prepare for his defense. Lang also argues that he was unable to establish a particularized need without knowing who testified at the grand jury or the content of their testimony.

{¶ 44} Lang's speculative claim that the grand jury testimony might have contained material evidence or might have aided his cross-examination does not establish a particularized need. See *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 68-69 (rejecting claim that the grand jury "must have" considered favorable or exculpatory evidence in returning the indictment); *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 71 (rejecting claim that "it seems apparent" that grand jury witnesses made statements that "may" have been inconsistent with other statements or "may" have contained other unspecified "exculpatory or impeachment information"); *State v. Webb*

(1994), 70 Ohio St.3d 325, 337, 638 N.E.2d 1023 (rejecting claim that grand jury testimony might have aided cross-examination by revealing contradictions).

{¶ 45} Lang's assertion that he did not know who testified during the grand jury or what they said provides no excuse for failing to establish a particularized need. Lang was required to show that nondisclosure of the grand jury transcripts would *probably* deprive him of a fair trial. *Greer*, 66 Ohio St.2d 139, 20 O.O.3d 157, 420 N.E.2d 982, paragraph three of the syllabus. Lang has failed to make such a showing, and nothing in the record (including the testimony under seal) supports it here. We find that the trial court did not abuse its discretion in ruling that Lang failed to establish a particularized need for the grand jury testimony.

{¶ 46} Based on the foregoing, we reject proposition VI.

{¶ 47} *Juror misconduct.* In proposition of law I, Lang argues that he was denied a fair trial because one of the jurors was related to Marnell Cheek, one of the victims.

{¶ 48} Before she was seated as a juror, juror No. 386 failed to disclose that her stepfather was Cheek's brother. Juror No. 386 failed to mention this relationship on either her juror questionnaire or her pretrial-publicity questionnaire. When asked to disclose her "personal knowledge" about the shooting deaths, juror No. 386 wrote, "Well the newspaper stated that both of them were shot execution style in the back of the heads over drugs." When asked to disclose what she had "heard, read, discussed or seen" concerning the shootings "from any source including * * * friends, neighbors, relatives, co-workers or family," juror No. 386 wrote, "None."

{¶ 49} Juror No. 386 also failed to disclose her relationship to Cheek during voir dire. Juror No. 386 indicated that she learned about the shootings from reading the newspaper but provided no further information about her relationship to Cheek during the questioning.

{¶ 50} Following the testimony of the state's first two witnesses, the prosecutor notified the court that Cheek's father had informed him that "Juror No. 386's mother is married to Marnell's brother." The trial court stated that he would address the matter during the "very next break."

{¶ 51} After the testimony of two more witnesses, the trial court, the prosecutor, and the defense counsel questioned juror No. 386 about her relationship to Cheek. Juror No. 386 acknowledged, "My mom is married to [Cheek's] brother" and that she had failed to previously disclose that information. Juror No. 386 also stated that she knew two of the spectators in the courtroom who were related to her mother through marriage. Juror No. 386 stated that she had met Cheek and had attended her funeral. However, juror No. 386 said that she had not talked to her mother, other relatives, or anybody else about the case. Despite her relationship to Cheek, juror No. 386 stated that she could remain fair. Finally, juror No. 386 stated that she had not talked to any of the other jurors about her relationship to Cheek.

{¶ 52} Following questioning, the prosecution moved to excuse juror No. 386, and the defense agreed. The trial court excused juror No. 386 and instructed her not to talk with any of the jurors about the case or why she was excused from the jury. Before leaving the courtroom, juror No. 386 reiterated that she had not previously talked to other jurors about this matter.

{¶ 53} Before the trial continued, the trial court informed the jurors that juror No. 386 had been excused because "she may have had a relative relationship with either a witness or a party or somebody that was involved in the case." The trial court then asked the jurors as a group whether any of them had had any discussions with juror No. 386 about this matter, and they indicated that they had not. The trial then resumed.

{¶ 54} First, Lang argues that the presence of juror No. 386 on the jury, even for a short period of time, deprived him of an unbiased jury. Yet "due

process does not require a new trial every time a juror has been placed in a potentially compromising situation. * * * Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ordered in *Remmer* [*v. United States* (1954), 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654] * * *. " *Smith v. Phillips* (1982), 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78; see also *Remmer* (when integrity of jury proceedings is in question, court "should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate"). Moreover, "a court will not reverse a judgment based upon juror misconduct unless prejudice to the complaining party is shown." *State v. Keith* (1997), 79 Ohio St.3d 514, 526, 684 N.E.2d 47.

{¶ 55} Nothing in the record supports Lang's claim that the jury was tainted by the presence of juror No. 386. Before being excused, juror No. 386 assured the court that she had not talked to any of the other jurors about her relationship to Cheek. The other jurors also indicated during group questioning that they had had no conversations with juror No. 386 about this matter. Thus, Lang's bias claim is speculative and unsupported by the evidence.

{¶ 56} Second, Lang argues that the trial court erred by failing to excuse juror No. 386 from the jury immediately after being informed of the juror's relationship to the victim. Lang contends that the continued presence of juror No. 386 during the testimony of two more witnesses tainted the jury.

{¶ 57} Defense counsel requested that the trial court talk to juror No. 386 before other witnesses testified, to eliminate any risk that the juror's presence might taint the jury. The trial court replied, "There is no risk at this point. * * * We will do it at the very next break. We will do it before this juror has any opportunity to go down and talk to the jury. We won't let the juror leave the

courtroom before she has a chance to go down and talk to them." The trial court then questioned juror No. 386 at the next break, and the juror was excused before she had had an opportunity to talk with the other jurors. Thus, this claim lacks merit.

{¶ 58} Finally, Lang argues that the trial court failed to conduct a hearing into the juror's misconduct and its possible effect on the other jurors as required by *Remmer*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654, and *State v. Phillips* (1995), 74 Ohio St.3d 72, 88-89, 656 N.E.2d 643. *Remmer* set forth the procedures that a trial court should follow for inquiring into possible jury misconduct: "The trial court should not decide and take final action ex parte * * * but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Remmer* at 229-230.

{¶ 59} The trial court conducted a *Remmer* hearing in the presence of the prosecutor, defense counsel, and the accused. The trial court and both counsel questioned juror No. 386. During questioning, juror No. 386 discussed her relationship to Cheek, admitted that she had failed to disclose this information to the court, and assured the court that she had not discussed this matter with any of the other jurors. Thereafter, the trial court questioned the other jurors as a group and obtained their assurance that they had not discussed this matter with juror No. 386. Neither the state nor the defense counsel objected to the questioning or requested an additional inquiry. Under these circumstances, we hold that no further inquiry was required.

{¶ 60} Nevertheless, Lang argues that the trial court was obligated to individually question each of the jurors to ensure that juror No. 386 had not spoken to them about Cheek. The trial court asked the jurors as a group: "Is there any member of the jury — I will take your silence if none did — but is there any

member of the jury that she did discuss this with at all?" The trial court then stated, "I take it by your silence that she did not."

{¶ 61} No case authority support's Lang's position. "The scope of voir dire is generally within the trial court's discretion, including voir dire conducted during trial to investigate jurors' reaction to outside influences." *State v. Sanders* (2001), 92 Ohio St.3d 245, 252, 750 N.E.2d 90. The trial court's questioning and the jurors' negative response obviated the need for individual questioning. Moreover, neither the state nor the defense requested that the trial counsel individually question the jurors following this response. Thus, the trial court did not abuse its discretion by stopping there. See *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 192; *State v. Henness* (1997), 79 Ohio St.3d 53, 65, 679 N.E.2d 686 (upholding trial court's failure to question each juror individually).

{¶ 62} However, Lang contends that the trial court should have individually questioned juror No. 387, because the judge noted that juror No. 386 and juror No. 387 were seated next to each other and had been friendly. But juror No. 386 assured the court that she had not talked to juror No. 387 about Cheek. Juror No. 387's silence during group questioning indicated that she had not talked to juror No. 386 about her relationship to any parties involved in the case. The trial court was permitted to rely on juror No. 387's silence in determining that juror's impartiality. See *McKnight* at ¶ 191. Trial counsel's failure to ask juror No. 387 any questions about possible conversations with juror No. 386 also indicated that the defense was satisfied with juror No. 387's response. Thus, the trial court did not abuse its discretion by failing to interrogate juror No. 387 individually.

{¶ 63} Based on the foregoing, we overrule proposition I.

{¶ 64} *DNA evidence.* In proposition of law II, Lang argues that expert testimony about DNA evidence linking him to the murder weapon was unreliable

and should not have been admitted. He asks us to reconsider our holding in *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 616 N.E.2d 909.

{¶ 65} Michele Foster provided expert testimony about the DNA found on the handgun used in the killings. She stated that DNA was detected from "at least two individuals" at three different locations on the handgun. The prosecutor then questioned Foster about the comparison of Lang's and Walker's DNA with the DNA found on the handgun:

{¶ 66} "Q: Do you have an opinion as to a reasonable degree of scientific certainty as to whose DNA appears on that handgun?

{¶ 67} "A: In this particular case, we can say that Antonio Walker is not the major source of DNA that we detected from the swabbing of the pistol.

{¶ 68} "In this case we, based on our comparison, we can say that Edward Lang cannot be excluded as a possible minor source to the DNA that we found on the weapon.

{¶ 69} "Q: When you say not excluded, what do you mean by that?

{¶ 70} "A: Well, in this particular case, because we had such low level DNA, we can't say to a reasonable degree of scientific certainty that this person is the source.

{¶ 71} "In this particular case, the chance of finding the major DNA profile that we found on that pistol is 1 in 3,461," meaning that "1 of 3,461 people could possibly be included as a potential source of the DNA."

{¶ 72} Lang argues that Foster's DNA testimony suggested that Lang was the source of the DNA even though she could not testify that he was the source "to a reasonable degree of scientific certainty." Therefore, he maintains, the testimony should not have been allowed. Lang failed to object to such evidence at trial, however, and thus waived all but plain error. *State v. Childs* (1968), 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus.

{¶ 73} Evid.R. 702(C) requires that an expert's testimony be based on "reliable scientific, technical, or other specialized information." Under Evid.R. 702(C), if the expert's "testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

{¶ 74} "(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts or principles;

{¶ 75} "(2) The design of the procedure, test, or experiment reliably implements the theory;

{¶ 76} "(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."

{¶ 77} In *D'Ambrosio*, 67 Ohio St.3d at 191, 616 N.E.2d 909, the court held that expert witnesses in criminal cases can testify in terms of possibility rather than in terms of a reasonable scientific certainty or probability. The treatment of such testimony involves "an issue of sufficiency, not admissibility." Id.; see also *State v. Jones* (2000), 90 Ohio St.3d 403, 416, 739 N.E.2d 300. "'Questions about the certainty of the scientific results are matters of weight for the jury.' " *State v. Allen*, 5th Dist. No. 2009-CA-13, 2010-Ohio-4644, ¶ 157, quoting *United States v. Brady* (C.A.6, 1979), 595 F.2d 359, 363.

{¶ 78} Expert testimony regarding DNA evidence is similarly treated. In *State v. Pierce* (1992), 64 Ohio St.3d 490, 597 N.E.2d 107, the court concluded that the trial court had properly admitted calculations as to the frequency probabilities of DNA evidence. *Pierce* held, "[Q]uestions regarding the reliability of DNA evidence in a given case go to the weight of the evidence rather than its admissibility. No pretrial evidentiary hearing is necessary to determine the reliability of the DNA evidence. The trier of fact, the judge or jury, can determine whether DNA evidence is reliable based on the expert testimony and other evidence presented." Id. at 501.

**{¶ 79}** Foster's DNA testimony was admissible and did not result in plain error. Lang offered no evidence challenging the DNA evidence or the manner in which the samples were tested or collected, preferring to rely upon cross-examination of the expert. During cross-examination, Foster acknowledged that the DNA profile could not be entered into the Combined DNA Index System ("CODIS"), because there was such a small amount of DNA. Foster stated that the "statistic has to be more than 1 in 280 billion" to "say to a reasonable degree of scientific certainty [that] this person is a source." These answers weakened the certainty of the DNA evidence. But the jury remained free to assign this evidence whatever weight it deemed proper in arriving at the verdict.

**{¶ 80}** Nevertheless, Lang attacks the admissibility of the DNA evidence on several grounds. First, Lang argues that this court should overrule *D'Ambrosio*, 67 Ohio St.3d 185, 616 N.E.2d 909, because its application to criminal but not civil cases denies him equal protection of the laws.

**{¶ 81}** Ohio has a split application of Evid.R. 702. Criminal cases adhere to the *D'Ambrosio* standard in allowing expert opinion in terms of possibilities to be admitted under Evid.R. 702. In contrast, Ohio courts require expert opinions in civil cases to rise to the level of probabilities before being admitted under Evid.R. 702. See *Stinson v. England* (1994), 69 Ohio St.3d 451, 633 N.E.2d 532, paragraph one of the syllabus; see also Jurs, Daubert, Probabilities and Possibilities, and the Ohio Solution: A Sensible Approach to Relevance Under Rule 702 in Civil and Criminal Applications (2008), 41 Akron L.Rev. 609, 630.

**{¶ 82}** The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, Section 1, commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws." The Equal Protection Clause does not prevent all classification, however. It simply forbids laws that treat persons differently when they are otherwise alike in all relevant respects. *Nordlinger v. Hahn* (1992), 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d

1. Lang's equal protection argument can be rejected because criminal defendants and civil litigants have vastly different stakes and concerns and are not similarly situated. See *Mason v. Home Depot U.S.A., Inc.* (2008), 283 Ga. 271, 274-275, 658 S.E.2d 603 (rejecting equal protection claim challenging more stringent requirements for admission of expert testimony in tort actions than in criminal cases).

{¶ 83} Second, Lang argues that the admission of Foster's expert testimony denied him his Sixth Amendment right to confrontation, because of his inability to confront a scientifically unreliable possibility. The Confrontation Clause of the Sixth Amendment to the United States Constitution gives the accused the right to be confronted with the witnesses against him. However, the Confrontation Clause guarantees only "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Emphasis sic.) *Delaware v. Fensterer* (1985), 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15.

{¶ 84} The trial court placed no limitations on the scope of cross-examination of Foster. Moreover, the record shows that Foster's cross-examination undermined the reliability of the DNA evidence by bringing out that such a small amount of DNA was found on the handgun that the DNA profile could not be entered into the CODIS database. Thus, we also reject this argument.

{¶ 85} Third, Lang argues that the admission of the DNA evidence failed to meet the Evid.R. 401, 402, and 403 requirements, which address "relevancy and its limits."

{¶ 86} Evid.R. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The "admission or exclusion of relevant evidence rests

within the sound discretion of the trial court." *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus. Foster's DNA testimony was relevant because it tended to link Lang to the handgun used to kill the two victims.

{¶ 87} In addition to relevancy, Evid.R. 403 requires a court to weigh the probative value of the evidence against the danger of unfair prejudice, confusion of the issues, or misleading the jury and to exclude evidence more prejudicial than probative. When considering evidence under Evid.R. 403, the trial court is vested with broad discretion. See *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 40.

{¶ 88} Lang argues that the DNA testimony should have been excluded because Foster's conclusions could not be made to a reasonable degree of scientific certainty, and it thereby misled the jury. Yet DNA evidence was highly probative in showing that Lang could not be excluded as a contributor of the DNA found on the handgun. DNA evidence also helped corroborate other evidence showing that Lang was the principal offender. Questions about the certainty of the DNA results went to the weight to be assigned to the evidence and not to its admissibility. See *State v. Allen*, 5th Dist. No. 2009-CA-13, 2010-Ohio-4644, ¶ 157.

{¶ 89} Lang also argues that the DNA evidence should have been excluded because the prosecutor improperly used it during his final argument to assert that the DNA proved that Lang was the actual killer. But the trial court was not required to exclude Foster's testimony because the prosecutor might later use such evidence with damaging effect during his final argument. "Unfair prejudice ' "does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest decision on an improper basis." ' " *United States v. Bonds* (C.A.6, 1993), 12 F.3d 540, 567, quoting *United States v. Schrock* (C.A.6, 1988), 855 F.2d 327, 335,

quoting *United States v. Mendez-Ortiz* (C.A.6, 1986), 810 F.2d 76, 79. Moreover, the record shows that the prosecutor's comments, which were not objected to, represented "fair inference." See *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 213-214. No plain error occurred.

{¶ 90} As a final matter, Lang argues that the improperly admitted DNA evidence requires reversal of his convictions because the state cannot prove beyond a reasonable doubt that this evidence did not affect the jury's decision. However, we reject this claim because the DNA evidence was properly admitted.

{¶ 91} Based on the foregoing, we overrule proposition II.

{¶ 92} *Prior consistent statements.* In proposition of law VII, Lang argues that Walker's prior consistent statements were improperly admitted under Evid.R. 801(D)(1)(b), a hearsay rule, and violated his Sixth Amendment right to confrontation.

{¶ 93} During the state's direct examination, Walker testified about his plea deal. He said that he had pleaded guilty to two counts of complicity to murder with firearm specifications and one count of complicity to commit aggravated robbery with a firearm specification. Walker also testified that he had received concurrent sentences for these offenses of "18 to life." The prosecutor then elicited the following testimony:

{¶ 94} "Q: And what were you asked to do because you were given that sentence?

{¶ 95} "A: Testify.

{¶ 96} "Q: Testify, how?

{¶ 97} "A: To give truthful testimony of the events of October 22.

{¶ 98} "Q: And that's the same story that you gave Detective Kandel when you were arrested on October 27?

{¶ 99} "A: Yes.

{¶ 100} "Q: Before you had any deal?

{¶ 101} "A: Yes."

{¶ 102} Evid.R. 801(D)(1)(b) authorizes the admission of prior consistent statements that are offered to rebut charges that the testimony is influenced by an improper reward. It provides:

{¶ 103} "(D) **Statements which are not hearsay**. A statement is not hearsay if:

{¶ 104} "(1) *Prior statement by witness*. The declarant testifies at trial or hearing and is subject to cross-examination concerning the statement, and the statement is

{¶ 105} "* * *

{¶ 106} "(b) consistent with declarant's testimony and is offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive * * *." (Boldface and italics sic.)

{¶ 107} Prior consistent statements that an offering party seeks to introduce to rehabilitate its witness must have been made *before* the alleged influence or motive to fabricate arose to be admissible under this rule. See *Tome v. United States* (1995), 513 U.S. 150, 157-158, 115 S.Ct. 696, 130 L.Ed.2d 574; *State v. Nichols* (1993), 85 Ohio App.3d 65, 71, 619 N.E.2d 80; *State v. Patel*, 9th Dist. No. 24030, 2008-Ohio-4693, ¶ 9.

{¶ 108} Lang argues that Walker's police statement should not have been admitted as a prior consistent statement, because it was made after his motive for fabrication arose. However, defense counsel failed to object to the admission of the statement at trial and waived all but plain error. See *Childs*, 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus. An alleged error is plain error only if the error is "obvious," *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240, and "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. Notice of plain error "is to

be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." Id. at paragraph three of the syllabus.

{¶ 109} During his opening statement, defense counsel told the jury that Walker had entered into a plea agreement that allowed him to plead guilty to lesser charges. Defense counsel also informed the jury that in exchange for this deal, Walker signed an agreement to "testify truthfully at any proceeding, including trials, involving the case of [his] Co-Defendant, Edward Lang." Defense counsel recited Walker's agreement: "I further understand that if I fail to cooperate and testify truthfully as agreed, this agreement and sentence can be voided by the State of Ohio, and I can be prosecuted to the fullest extent as allowed by law including have a consecutive sentence imposed." Defense counsel then concluded his opening statement by stating: "[A]fter you have heard all of the evidence you will come to the conclusion that the only evidence against Eddie Lang are the *statements of a person or persons with an interest in the case*." (Emphasis added.)

{¶ 110} Defense counsel's opening statement implied that Walker had had a motive to lie because of the favorable terms of his pretrial agreement. This was an allegation of recent fabrication or improper influence that allowed the state to introduce Walker's prior consistent statements to rehabilitate his testimony. See *State v. Wolff*, 7th Dist. No. 07 MA 166, 2009-Ohio-2897, ¶ 78 (allegations of recent fabrication during opening statement provided grounds for admitting prior consistent statement).

{¶ 111} Furthermore, Walker had made the statements at issue *before* he entered into his pretrial agreement. See *State v. Howe* (Sept. 30, 1994), 2d Dist. App. No. 13969, 1994 WL 527612, *9 (prior consistent statement made before an offer of leniency admissible following a defense allegation that the offer established a motive to falsify); *State v. Mullins* (1986), 34 Ohio App.3d 192, 197,

23

517 N.E.2d 945. Thus, no error, plain or otherwise, occurred when the trial court admitted Walker's prior consistent statements.

{¶ 112} Lang invokes *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, in arguing that Walker's testimony about his prior consistent statements violated his right to confrontation because those first statements had not been subject to cross-examination. In *Crawford*, the Supreme Court held that the Confrontation Clause bars "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Id. at 53-54.

{¶ 113} Lang argues that Walker's prior statement violated *Crawford*, because he did not have an earlier opportunity to cross-examine Walker about his police statement. But Walker testified at trial and was subject to cross-examination. "[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. * * * The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." Id. at 59, fn. 9. Accordingly, we reject Lang's *Crawford* claim.

{¶ 114} Based on the foregoing, we overrule proposition VII.

{¶ 115} *Inflammatory evidence and gruesome photographs.* In proposition of law VIII, Lang argues that the prosecutor elicited irrelevant and inflammatory evidence.[2] He also argues that the trial court erred in admitting gruesome crime-scene and autopsy photographs. He claims that the Rules of Evidence prohibit the introduction of this information.

{¶ 116} Under Evid.R. 404(B), "Evidence of other crimes, wrongs, or acts is not admissible to prove" a defendant's character in order to show criminal

---

2. Lang's claims in this proposition are made against the prosecutor but are not alleged in terms of prosecutorial misconduct. In proposition of law IX, Lang recasts some of these allegations as prosecutorial misconduct.

propensity. "It may, however, be admissible * * * [to show] proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

{¶ 117} 1. Inflammatory evidence. First, Lang argues that Walker improperly testified, over defense objection, that Lang wore red all the time. However, the trial court sustained the defense objection when the prosecutor asked Walker whether he was "familiar with the significance of red."

{¶ 118} Lang argues that Walker's testimony about the color red should not have been admitted because the implication was that Lang was a member of the "Bloods" gang. The state counters that the testimony that Lang wore red was relevant in showing his familiarity with firearms and the drug culture, and it contends that the very nature of these crimes pointed to gang-related homicides. However, no evidence was presented at trial linking the two murders to gang activity. Accordingly, testimony that Lang frequently wore red was irrelevant and should not have been admitted. But the testimony was brief, and no explanation was presented linking the color red to gang activity. Given the substantial evidence of Lang's guilt, such testimony constituted harmless error.

{¶ 119} Second, Lang argues that Sergeant John Dittmore, a Canton police officer, improperly testified that he supervises the police department's "Gang Unit." But trial counsel's failure to object to this testimony waived all but plain error. *Childs*, 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus.

{¶ 120} Lang argues that testimony about Dittmore's duties with the gang unit implied that he was involved in the investigation because of Lang's gang activity. In response, the state argues that Dittmore's testimony about his duties was relevant because of the possible gang-related nature of these crimes. This testimony was irrelevant and should not have been admitted, because there was no evidence linking the murders with gang activity. However, this testimony did not

result in plain error in this case. Dittmore's testimony made no reference to Lang's gang involvement or affiliation, if any. Dittmore also testified that he worked closely with narcotics investigators, which would have explained why he was involved in this murder investigation.

{¶ 121} Third, Lang argues that Walker and Seery improperly testified that Lang's nickname was "Tech," or "Tek." Lang claims that this nickname suggested that he was familiar with guns and was violent, because "Tech" is shorthand for a type of 9 mm handgun. However, Lang failed to object to this testimony and thus waived all but plain error.

{¶ 122} There was no testimony explaining the meaning of Lang's nickname or its association with a 9 mm handgun. It is speculative to conclude that the jurors made such a connection. Thus, no plain error occurred. See *State v. Gillard* (1988), 40 Ohio St.3d 226, 230, 533 N.E.2d 272 (testimony that defendant's nickname was "Dirty John" was not plain error).

{¶ 123} Fourth, Lang argues that Sergeant Dittmore's testimony improperly suggested that Lang had previously purchased illegal drugs. Dittmore testified, over defense objection, that drug dealers do not sell drugs and deal with people they do not know. During redirect examination, Dittmore clarified that "small amounts of crack cocaine that are bought on the street, the street level dealers will sell to anybody. But larger amounts as in a quarter ounce of powder or crack or whatever is a larger amount of drugs * * *. That's going to be done more surreptitiously behind the scenes, and those people generally know each other." But Lang did not object to this testimony and waived all but plain error.

{¶ 124} Dittmore's redirect testimony showed the likelihood that Lang knew Burditte when he called him and set up the drug deal for a quarter ounce of crack cocaine. Such testimony was relevant because Lang told police he did not know Burditte prior to calling him. It also suggested that Lang's motive to kill

Burditte was to avoid identification. Thus, Dittmore's redirect testimony was relevant and did not constitute plain error.

{¶ 125} Fifth, Lang argues that Walker improperly testified that after the murders, Lang vomited and said, "[E]very time I do this, this same thing happens." Lang claims that the prosecution used this testimony to imply that Lang had previously killed someone. However, defense counsel's failure to object to this testimony waived all but plain error.

{¶ 126} Lang's conduct and comments after the murders were relevant in reflecting his consciousness of guilt. See *State v. Richey* (1992), 64 Ohio St.3d 353, 357, 595 N.E.2d 915. Moreover, the prosecution made no attempt to use Lang's comments as showing that he had previously murdered other people. No plain error occurred.

{¶ 127} Sixth, Lang argues that his statement admitting that he might be guilty of conspiracy to commit murder was improperly admitted. During the state's case-in-chief, the prosecution played the tape-recorded statement that Lang made to the police. The trial court, over defense objection, allowed the prosecutor to play a segment of the tape that included Lang's admission to conspiracy to commit murder:

{¶ 128} "(Officer) Kandel: * * * When everything went bad and you felt so bad about it, why didn't you call the police?

{¶ 129} "Lang: Basically that he used my gun and then that I was in the car when that shit happenin'. And then as though, you know what I'm sayin', that's *conspiracy to murder*.

{¶ 130} "* * *

{¶ 131} "Kandell: That's what you believe?

{¶ 132} "Lang: Yeah. If you right there at the scene of a crime and you witness somethin' or you bein' a part of somethin' no matter how much you

played a part in it, if you involved in it, * * * that's *conspiracy to murder*." (Emphasis added.)

{¶ 133} After the tape was played, the trial court provided the jury with the following limiting instructions: "You may have heard in the statement some references by both sides to a concept known as conspiracy to murder. I would indicate to you that there are no charges in this case that alleged conspiracy to murder. You may take the Defendant's statement or the statements of the officers if they deal with the facts of this case, but not as they may discuss any legal conclusions because they may be correct or incorrect legally."

{¶ 134} Lang's opinion that he might be guilty of conspiracy to commit murder was irrelevant. No prejudicial error, however, resulted from playing this segment of Lang's statement, because the trial court's limiting instructions ensured that the jury did not improperly consider it. See *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 49; *State v. Heinish* (1990), 50 Ohio St.3d 231, 241, 553 N.E.2d 1026.

{¶ 135} Seventh, Lang argues that Walker falsely testified that he did not know the make and model of the murder weapon. Walker testified that he saw Lang with a handgun before the murders. He testified, "[I]t was a grey and black gun. I didn't know what kind of gun it was at the time, but I found out it was a .9 [sic] millimeter." Walker later testified that while waiting for Burditte to arrive at the meeting point, Lang had trouble placing a round in the handgun. Walker also testified that he knew how to chamber a round on a 9 mm handgun.

{¶ 136} Lang claims that Walker's familiarity with how to load a 9 mm handgun shows that Walker lied when he said that he did not know the make and model of Lang's handgun. However, Walker's statement that he knew how to load a 9 mm handgun does not establish that Walker lied when he stated, "I didn't know what kind of gun it was at the time." Walker's credibility was a matter for

28

the jury to decide after they heard his testimony. Moreover, the defense failed to object to such testimony and waived all but plain error. No plain error occurred.

{¶ 137} Finally, Lang argues that unreliable DNA evidence was improperly admitted. But as discussed in proposition II, this argument lacks merit.

{¶ 138} 2. Gruesome photographs. Lang argues that the trial court erred in admitting two gruesome crime-scene photographs and three gruesome autopsy photographs. However, trial counsel failed to object to this evidence at trial and waived all but plain error with respect to those exhibits. *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 132.

{¶ 139} In capital cases, nonrepetitive photographs, even if gruesome, are admissible as long as the probative value of each photograph substantially outweighs the danger of material prejudice to the accused. *State v. Morales* (1987), 32 Ohio St.3d 252, 257, 513 N.E.2d 267; *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus. Decisions on the admissibility of photographs are "left to the sound discretion of the trial court." *State v. Slagle* (1992), 65 Ohio St.3d 597, 601, 605 N.E.2d 916.

{¶ 140} State's exhibit No. 33-P is a decidedly gruesome photograph showing the bodies of Cheek and Burditte inside the Durango after the shooting. This photograph was probative of Lang's intent and the manner and circumstances of the victims' deaths. See *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 92. No plain error resulted from admitting this photograph.

{¶ 141} State's exhibit No. 33-R shows where a shell casing was found on the bloodstained area behind the passenger seat. However, the "photos of blood stains * * * do not have a shock value equivalent to a photograph of a corpse. The term 'gruesome' in the context of photographic evidence should, in most cases, be limited to depictions of actual bodies or body parts." *State v. DePew*

(1988), 38 Ohio St.3d 275, 281, 528 N.E.2d 542. Thus, the photograph of the bloodstains was not precluded from admission into evidence.

{¶ 142} State's exhibits Nos. 31A and B are autopsy photographs depicting the entry and exit gunshot wounds on Cheek's head. State's exhibit No. 32B depicts the exit wound of the gunshot through Burditte's mouth. Although these photographs are gruesome, each of them supported the coroner's testimony and provided a perspective of the victims' wounds. No plain error occurred in admitting these photographs. See *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 148.

{¶ 143} Based on the foregoing, proposition VIII is overruled.

{¶ 144} *Instructions*. In proposition of law IV, Lang argues that the trial court's instructions on the R.C. 2929.04(A)(7) specification failed to provide the jury with the option of finding that he was guilty under either the principal-offender element or the prior-calculation-and-design element of that specification.

{¶ 145} Lang failed to object to these instructions and waived all but plain error. *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. Moreover, defense counsel's proposed instructions included the language that Lang now contends was erroneous. Thus, the defense invited any error and may not " 'take advantage of an error which he himself invited or induced.' " *State v. Bey* (1999), 85 Ohio St.3d 487, 493, 709 N.E.2d 484, quoting *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co.* (1986), 28 Ohio St.3d 20, 28 OBR 83, 502 N.E.2d 590, paragraph one of the syllabus.

{¶ 146} During final instructions, the trial court advised the jury that it could find Lang guilty of aggravated murder in Counts One and Two if the jurors found that he "purposely caused the death" of the victims "while committing, attempting to commit, or fleeing immediately after committing or attempting to commit the offense of aggravated robbery and/or did aid or abet another in so doing."

{¶ 147} The trial court also advised the jury that it could find Lang guilty of Specification Three, the felony-murder death-penalty specification that accompanied Counts One and Two, if it found that the "State proved beyond a reasonable doubt that the aggravated murder as set forth in [Counts One and Two] was committed while the Defendant was committing * * * the offense of aggravated robbery and the Defendant was the principal offender in the commission of the aggravated murder." The trial court advised the jury that the term "principal offender" meant the "actual killer."

{¶ 148} Lang argues that the trial court's instructions on the R.C. 2929.04(A)(7) specifications were incomplete because they did not advise the jury of the option of finding him guilty of the "prior calculation and design" alternative as set forth in the statute. Lang also argues that the jury may have found him guilty because the jurors were presented with an all-or-nothing choice between finding him guilty as the shooter or acquitting him. Compare *Beck v. Alabama* (1980), 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392.

{¶ 149} Pursuant R.C. 2929.04(A)(7), a defendant found guilty of aggravated murder may also be found guilty of this death-penalty specification if the defendant committed one of the enumerated felony murders and was either "the principal offender in the commission of the aggravated murder *or*, if not the principal offender, committed the aggravated murder with prior calculation and design." (Emphasis added.)

{¶ 150} In *Beck*, the United States Supreme Court struck down an Alabama statute that prohibited lesser-included-offense instructions in capital cases. In so holding, the court stated, "[O]n the one hand, the unavailability of * * * convicting on a lesser included offense may encourage the jury to convict for an impermissible reason—its belief that the defendant is guilty of some serious crime and should be punished. On the other hand, the apparently mandatory nature of the death penalty may encourage it to acquit for an equally impermissible

31

reason—that, whatever his crime, the defendant does not deserve death. * * * [T]hese two extraneous factors * * * introduce a level of uncertainty and unreliability into the factfinding process that cannot be tolerated in a capital case." Id. at 642-643. See also *Schad v. Arizona* (1991), 501 U.S. 624, 646-647, 111 S.Ct. 2491, 115 L.Ed.2d 555.

{¶ 151} Here, the trial court's instructions on aggravated-murder counts presented the jury with the option of finding Lang guilty as the principal offender or as an aider or abettor. Unlike in *Beck*, the jury was presented with two options of finding Lang guilty of the aggravated-murder counts. The jury was instructed to consider the death-penalty specifications after making findings on the aggravated-murder counts. Under these circumstances, it is illogical to conclude that the jury would find the defendant guilty of Counts One and Two as an aider or abettor, but find him guilty of Specification Three as the principal offender. Accordingly, the court's instructions were not constitutionally defective.

{¶ 152} Moreover, Lang would have still been eligible for the death penalty if the jury had found that he had committed the aggravated murder with prior calculation and design. Thus, even if there was a *Beck* violation, such error was harmless.

{¶ 153} We reject Lang's claims on the basis of plain error and invited error and overrule proposition IV.

{¶ 154} *Prosecutorial misconduct.* In proposition of law IX, Lang argues that the prosecutor committed misconduct during the guilt-phase proceedings. However, except where noted, defense counsel failed to object and waived all but plain error. *Childs*, 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus.

{¶ 155} The test for prosecutorial misconduct is whether the remarks were improper, and if so, whether they prejudicially affected the accused's substantial rights. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883.

The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *Phillips*, 455 U.S. at 219, 102 S.Ct. 940, 71 L.Ed.2d 78.

{¶ 156} First, Lang argues that the prosecutor committed misconduct by improperly seeking a commitment from the prospective jurors that they would sign a death verdict. During voir dire, the prosecutor asked the prospective jurors whether they could sign a death verdict if all 12 of them agreed that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt. The prosecutor then asked individual jurors whether they could do so.

{¶ 157} The prosecutor's questioning was proper because the relevant inquiry during voir dire in a capital case is whether the juror's beliefs would prevent or substantially impair his or her performance of duties as a juror in accordance with the instructions and the oath. *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 76, citing *Wainwright v. Witt* (1985), 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841. "Clearly, a juror who is incapable of signing a death verdict demonstrates substantial impairment in his ability to fulfill his duties." *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 34. Accordingly, Lang's argument in this regard is not well taken.

{¶ 158} Second, Lang argues that the prosecutor committed misconduct by failing to lay a foundation to establish Sergeant Dittmore's expertise before presenting his testimony about drug dealers and drug transactions. As discussed in proposition VIII, Dittmore testified that drug dealers sell "larger amounts of drugs * * * surreptitiously behind the scenes, and those people generally know each other."

{¶ 159} Pursuant to Evid.R. 702(B), an expert may be qualified by reason of his or her "specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony" to give an opinion that will assist the jury in understanding the evidence and determining a fact at issue. Dittmore testified that he had experience setting up drug transactions in his present job and

while serving on the police department's vice unit. Dittmore's specialized knowledge of drug-related transactions was knowledge of a matter not possessed by the average layman. Accordingly, Dittmore was qualified to testify as an expert on these matters under Evid.R. 702. Given Dittmore's qualifications, the prosecutor's failure to tender Dittmore as an expert was of no consequence and did not result in plain error. See *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 97.

{¶ 160} Lang also argues that the prosecutor committed misconduct during closing arguments by telling the jury that DNA evidence found on the handgun "proves * * * beyond a reasonable doubt that Eddie Lang * * * is the actual killer." He contends that expert testimony offered in regard to the DNA evidence does not support the prosecutor's argument. Lang incorporates his argument from proposition II in claiming that the DNA evidence was unreliable and should not have been admitted, because Foster could not testify to "a reasonable degree of scientific certainty" that Lang was the source of DNA on the handgun. However, as discussed in proposition II, the DNA evidence was properly admitted. Thus, the prosecutor's argument about the DNA evidence was a reasonable theory and represented a fair inference based on the record. No plain error occurred.

{¶ 161} Fourth, Lang asserts the existence of prosecutorial misconduct in speculative comments made during closing argument, claiming that the prosecutor argued, over defense objection, that Lang "took the gun * * * and turned it toward Marnell who saw it coming because she put her hand up." Lang asserts that the prosecutor's assertion that Cheek raised her hand to ward off the fatal gunshot was not supported by the evidence.

{¶ 162} Dr. Murthy, the coroner, testified that Cheek was shot at close range, and the bullet had entered the left side of her head above the ear. He also testified that there was a "prominent area of stippling" found on the back of

Cheek's left hand, which indicated that her hand was only a "few inches" from the muzzle of the gun. The evidence also showed that Cheek had been sitting in the front passenger seat and she had been shot from behind. Thus, the prosecutor's argument represented a fair inference that could be made from the record. See *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 214-215.

{¶ 163} Lang also claims that the prosecutor's argument that Cheek "saw it (the bullet) coming because she put her hand up" was a comment that improperly focused on what the victim experienced in the final moments of her life. But the prosecutor's comments were not such remarks. Compare *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 357, 662 N.E.2d 311. Even if the comments were improper, any errors were corrected by the trial court's instructions that the arguments of counsel were not evidence and that the jury was the sole judge of the facts. See *State v. Waddy* (1992), 63 Ohio St.3d 424, 436, 588 N.E.2d 819.

{¶ 164} Additionally, Lang contends that the prosecutor improperly speculated during his final argument that Lang's DNA was on the handgun "[f]rom firing the gun." Michael Short, a forensic expert, testified: "The discharging of a firearm would greatly increase the probability of finding * * * what they call touch DNA on the surfaces of a firearm." Lang's argument fails, because the prosecutor's argument represented a fair characterization of Short's testimony. No plain error occurred.

{¶ 165} Fifth, Lang argues that the prosecutor improperly vouched for several of the state's witnesses. An attorney may not express a personal belief or opinion as to the credibility of a witness. *State v. Williams* (1997), 79 Ohio St.3d 1, 12, 679 N.E.2d 646. "Vouching occurs when the prosecutor implies knowledge of facts outside the record or places his or her personal credibility in issue." *Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 232.

{¶ 166} Lang claims that the prosecutor improperly vouched for Walker's testimony and bolstered Walker's claim that he did not shoot Cheek and Burditte. The prosecutor argued: "We know Antonio didn't enter the truck because he tells us that." These comments simply argue the evidence. The comments do not vouch for Walker's veracity or imply knowledge of facts outside the record.

{¶ 167} Lang also claims that the prosecutor vouched for the testimony of Short and his identification of the handgun. The prosecutor stated: "We know that this is the murder weapon beyond a reasonable doubt. Mike Short told you that." This is not vouching. The prosecutor merely summarized the evidence supporting his argument by referring to the witness who provided the testimony. Lang's argument is unpersuasive and rejected.

{¶ 168} Lang further claims that the prosecutor vouched for Seery's testimony. Here, the prosecutor argued: "But I submit to you, and you judge his credibility and you look at what he knew, he is telling the truth." The trial court sustained a defense objection to these comments and instructed the jury to "disregard the Prosecutor's indication that he believes that he was telling the truth." Thus, the trial court's instructions cured the effect of any improper vouching. See *State v. Garner* (1995), 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (jury is presumed to follow the trial court's curative instructions).

{¶ 169} In addition, Lang recasts several of his objections in proposition VIII into claims of prosecutorial misconduct. Lang claims prosecutorial misconduct in introducing (1) testimony that Lang frequently wore red, to suggest to the jurors that he was a gang member, (2) Dittmore's testimony that he was a member of the police department's gang unit, (3) testimony that Lang's nickname was "Tech," in an effort to associate him with guns, (4) Walker's testimony that Lang vomited after the murders and said, "[E]very time I do this, this same thing happens," (5) Lang's statement that he may be guilty of conspiracy to commit murder, and (6) Walker's testimony about the make and model of the murder

weapon.  But as discussed in proposition VIII, testimony that Lang frequently wore red constituted harmless error, and Lang's opinion about his guilt of conspiracy was not prejudicial.  None of the other claims rise to the level of plain error.

{¶ 170} Finally, Lang argues that the extensive prosecutorial misconduct during the guilt phase carried over into the jury's penalty-phase deliberations.  We reject this argument because prejudicial misconduct did not occur.

{¶ 171} Based on the foregoing, proposition IX is overruled.

{¶ 172} *Ineffective assistance of counsel.*  In proposition of law X, Lang asserts that his counsel were ineffective during the guilt-phase proceeding.  Reversal of a conviction based on ineffective assistance requires that the defendant show first that counsel's performance was deficient, and second that the deficient performance prejudiced the defendant so as to deprive the defendant of a fair trial.  *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.  Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

{¶ 173} First, Lang argues that his counsel were ineffective by failing to forcefully challenge the state's DNA evidence.  However, the record belies this claim.  During cross-examination, defense counsel elicited from Michele Foster, the state's DNA expert, that there was such a small amount of DNA obtained from the handgun that the DNA profile could not be entered into the CODIS database.  Counsel also elicited from Foster, "[W]hen we say to a reasonable degree of scientific certainty this person is a source, that statistic has to be more than 1 in 280 billion."

{¶ 174} Lang also argues that defense counsel should have moved to suppress the DNA evidence under Evid.R. 401 through 403 (relevant evidence).  As discussed in proposition II, the state's DNA evidence was relevant because it tended to connect Lang to the handgun used to kill the victims.  In addition, the

trial court could have determined that the admission of the DNA evidence outweighed any danger of unfair prejudice, confusion of the issues, or misleading the jury. Thus, this ineffectiveness claim also lacks merit.

{¶ 175} Next, Lang argues that his counsel were ineffective by conceding that the DNA found on the handgun matched his DNA. During closing argument, his counsel stated:

{¶ 176} "The gun. I was interested in noting how Mr. Barr misstated the facts. He said Eddie Lang's DNA is on the gun.

{¶ 177} "That's not what I heard. I think the Crime Lab people said that he can't be excluded. I think that's what they said. I don't think they said it is conclusive.

{¶ 178} "Plus, there was some minor DNA that they couldn't identify whose DNA it was. *But maybe I am wrong. Maybe they did say that. It is conclusively Eddie Lang's DNA. Maybe that's true*." (Emphasis added.)

{¶ 179} Counsel's argument was a poor attempt to rectify his previous misstatements about the DNA evidence. But Lang contends that defense counsel's concession was unduly prejudicial because there was no conclusive proof that his DNA was found on the handgun. Even assuming that counsel's approach was deficient, Lang fails to establish prejudice under the *Strickland* test. Evidence that Lang's DNA might be on the handgun was not surprising, because the handgun was his. Moreover, such evidence was not crucial to the outcome of the defense case. Lang's defense was that he gave Walker his handgun, and Walker shot the victims. Thus, testimony that Walker's DNA was not found on the handgun was the key evidence, and testimony about Lang's DNA was not. This ineffectiveness claim is rejected.

{¶ 180} Second, Lang argues that counsel were ineffective during final argument by comparing the jury to a lynch mob. During final argument, trial counsel stated:

{¶ 181} "A lynch mob is made up of the same people that make up a jury. They are citizens of the community, employers, employees, taxpayers, voters, they are the same people.

{¶ 182} "So what separates them? One thing separates a lynch mob from a jury and one thing only. That's your oath of office.

{¶ 183} "* * *

{¶ 184} "They (a lynch mob) are not interested in evidence. They are not interested in the fact that there is no forensic evidence linking Eddie Lang to either one of those murders. They are not interested in that.

{¶ 185} "A jury is. A jury is interested, and they want to know of four people in that vehicle on October 22, why do you run tests on three of them and not the guy that got the deal?

{¶ 186} "Why run tests on Jaron Burditte's clothes? Why run tests on Marnell Cheek's clothes? Why run tests on Eddie Lang's clothes, and stop, come to a halt with Antonio Walker's clothes? Why?

{¶ 187} "A jury, not a lynch mob, would be interested in that. They are made up of the same people.

{¶ 188} "Now, just because a jury takes an oath of office does not mean that they have to act like a jury. They can go in the jury room, close the jury door, hey, let's flip a coin. So guilty, let's go. Okay. Jury has spoken.

{¶ 189} "But the problem is violence was done to not only the Defendant but beyond that. Violence was done to the system. If I am indicted, if the Court is indicted, Prosecutor is indicted, if Mr. Koukoutas is indicted, even if one of those Deputies are indicted, the only safeguard we have is the oath of office.

{¶ 190} "Life will go on for everybody in this courtroom. If you act like a jury or if you act like a lynch mob."

{¶ 191} Lang argues that trial counsel lost credibility and alienated the jury when he made his lynch-mob argument. Lang contends that the jury may

have perceived counsel's lynch-mob comparison as an attempt to play the race card, particularly because an African-American counsel made the argument on behalf of an African-American defendant.

{¶ 192} Counsel for both sides are afforded wide latitude during closing arguments. *State v. Brown* (1988), 38 Ohio St.3d 305, 317, 528 N.E.2d 523. Debatable trial tactics generally do not constitute a deprivation of effective counsel. *State v. Phillips*, 74 Ohio St.3d at 85, 656 N.E.2d 643. Trial counsel's lynch-mob argument focused the jury's attention on their oath and obligation as jurors. Counsel's argument also highlighted the lack of forensic testing conducted on Walker's clothing. Lang's claim that counsel's argument alienated the jury by presenting the imagery of racist brutality is speculative. Thus, counsel's decision to make this argument was a "tactical" decision and did not rise to the level of ineffective assistance. See *Bradley*, 42 Ohio St.3d at 144, 538 N.E.2d 373.

{¶ 193} Third, Lang argues that his counsel were ineffective by failing to hire a forensic expert to conduct independent testing of Walker's clothing to obtain evidence to support his claim that Walker was the principal offender.

{¶ 194} The police seized Walker's shoes and the hooded sweatshirt he was wearing on the night of the murders, but not his pants. Foster examined Walker's shoes and hooded sweatshirt and found no blood or trace evidence. Gunshot-residue tests were not conducted on these clothes, because the state never requested it.

{¶ 195} Lang argues that defense counsel were ineffective by failing to secure a forensic expert to test the pants that Walker was wearing on the night of the murders for bloodstains and gunshot residue. However, counsel could not make such a request, because the police never seized his pants. Thus, this ineffectiveness claim lacks merit.

{¶ 196} As for the other clothing, counsel's failure to pursue independent testing of them appears to have been a tactical decision. See *State v. Hartman*

(2001), 93 Ohio St.3d 274, 299, 754 N.E.2d 1150. Moreover, defense counsel used the state's failure to conduct testing of Walker's clothing during closing arguments as a reason for finding him not guilty. Finally, resolving this issue in Lang's favor would be speculative. "Nothing in the record indicates what kind of testimony an * * * expert could have provided. Establishing that would require proof outside the record, such as affidavits demonstrating the probable testimony. Such a claim is not appropriately considered on a direct appeal." *State v. Madrigal* (2000), 87 Ohio St.3d 378, 390-391, 721 N.E.2d 52.

{¶ 197} Fourth, Lang argues that his counsel were unprepared to effectively cross-examine Dr. Murthy, the coroner. During cross-examination of Dr. Murthy, defense counsel asked about finding a firearm:

{¶ 198} "Q: Okay. When you examined the body of Jaron Burditte, you took a firearm off of that body, didn't you?

{¶ 199} "Mr. Scott (prosecutor): Objection.

{¶ 200} "Mr. Beane (trial counsel): It is in his report, Your Honor.

{¶ 201} "Mr. Barr (prosecutor): Where?

{¶ 202} "The Court: Let's find it in the report.

{¶ 203} "Mr. Beane: On the bottom, weapon, firearm.

{¶ 204} "Mr. Barr: No, no, that is the cause.

{¶ 205} "The Court: You can ask the question.

{¶ 206} "Q: The weapon down is firearm. That is the cause of death, not the fact that that is on him?

{¶ 207} "* * *

{¶ 208} "A: Yes, yes.

{¶ 209} "Q: Thank you.

{¶ 210} "The Court: So that the jury understands, in looking at the report, it was not on the person. It was just indicated that that was the cause of death."

{¶ 211} Lang contends that trial counsel's questioning showed that his counsel were unprepared and diminished their credibility with the jury. These claims are speculative. Moreover, counsel's mistake was quickly corrected to ensure that the jury was not misled. Thus, counsel's misstep made no difference in the outcome of the case.

{¶ 212} Fifth, Lang argues that his counsel were ineffective by failing to challenge the chain of custody of the handgun seized from the defendant's vehicle. Lang does not assert that there was an actual problem with the chain of custody. Rather, he contends that the state failed to establish the chain of custody for the gun between the time it was seized and when it was taken to the lab.

{¶ 213} Counsel's action appears to have been a tactical decision. Nothing in the record indicates that there was a problem with the chain of custody. Moreover, Sergeant Gabbard testified that the handgun was collected and forwarded to the Stark County Crime Lab. Given the strong presumption that counsel's performance constituted reasonable assistance, this claim is rejected. *Bradley*, 42 Ohio St.3d at 144, 538 N.E.2d 373.

{¶ 214} Sixth, Lang argues that his counsel were ineffective by failing to request the court to seal the prosecutor's file for appellate purposes. Lang contends that sealing was necessary to ensure the complete disclosure of exculpatory evidence as required by *Brady v. Maryland* (1963), 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215. But the court was not required to seal the prosecutor's file based on speculation that the prosecutor might have withheld exculpatory evidence. *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 123. Moreover, we denied a defense motion to seal the prosecutor's file that was filed with this court. *State v. Lang*, 118 Ohio St.3d 1469, 2008-Ohio-3153, 889 N.E.2d 545. Thus, this claim is also rejected.

{¶ 215} As a final matter, Lang raises other alleged acts of ineffective assistance of counsel, but even if we assume deficient performance by counsel,

none prejudiced him.  *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.  As discussed in other propositions of law, Lang was not prejudiced by his counsel's failure to object to the indictment (III), the instructions on the R.C. 2929.04(A)(7) specifications (IV), Walker's prior consistent statement (VII), gruesome photographs (VIII), prosecutorial misconduct (IX), or the failure to request the individual voir dire of jurors about their possible discussions with juror No. 386 (I).

{¶ 216} Furthermore, Lang was not prejudiced by his counsel's failure to object to testimony that his nickname was "Tech," or that Lang vomited and said, "[E]very time I do this, this same thing happens," or Walker's testimony about the make and model of the handgun (VIII).  Lang also suffered no prejudice from counsel's failure to object to Dittmore's testimony that he was employed by the police department's gang unit or his testimony about the selling practices of drug dealers (VIII).

{¶ 217} Based on the foregoing, we overrule proposition X.

{¶ 218} *Sufficiency and manifest weight of the evidence*.  In proposition of law V, Lang challenges both the sufficiency and manifest weight of the evidence to convict him as the principal offender of the aggravated murders as charged in Specification Three of Counts One and Two.

{¶ 219} A claim raising the sufficiency of the evidence invokes a due process concern and raises the question whether the evidence is legally sufficient to support the jury verdict as a matter of law.  *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541.  In reviewing such a challenge, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."  *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

**{¶ 220}** A claim that a jury verdict is against the manifest weight of the evidence involves a different test. " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

**{¶ 221}** Lang's sufficiency claims lack merit. Walker's and Seery's testimony, evidence that the murder weapon was found in Lang's possession, and DNA evidence sufficiently established Lang's guilt as the principal offender. The evidence showed that on the night of October 22, 2006, Lang and Walker agreed to rob a drug dealer. Lang suggested that they rob Burditte. Their plan was to meet Burditte, enter his car, and rob him. Lang then called Burditte and arranged a meeting to purchase crack cocaine from him that evening.

**{¶ 222}** Lang and Walker went to the meeting location later that night. Lang carried a 9 mm handgun and loaded it while they waited for Burditte to arrive. Shortly thereafter, Burditte and Cheek arrived. According to Walker, Lang got into the backseat of their vehicle and shot Burditte and Cheek.

**{¶ 223}** On the following day, Lang went to Seery's house and admitted to him that he had shot the victims. When the police later arrested Lang, they found a 9 mm handgun in the backseat of the car that he was driving. Forensic examination of the handgun identified it as the murder weapon. Additionally, Foster testified that Lang could not be excluded as a possible source of DNA that was found on the handgun.

**{¶ 224}** Nevertheless, Lang argues that the evidence is insufficient to convict him. Lang asserts that Walker's testimony was not credible, because he

accepted a plea deal in exchange for his testimony against him. He also argues that Seery's testimony should be discounted because Seery had initially told police that he did not know anything about the killings. But these claims call for an evaluation of Walker's and Seery's credibility, which is not proper on review of evidentiary sufficiency. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 200.

{¶ 225} Lang also argues that none of his clothing was found with blood or gunshot residue, and Walker's clothing was untested. But Foster testified that she examined Walker's hooded sweatshirt and shoes and found no blood or other trace evidence linking Walker to the murders.

{¶ 226} Finally, Lang argues that none of the scientific evidence established that he was the principal offender. This argument overlooks evidence tending to show that Lang's DNA was found on the handgun and Walker's DNA was not. However, Lang continues to argue that the DNA evidence was unreliable because testing did not establish that his DNA was found on the handgun to a reasonable degree of scientific certainty. As discussed in proposition II, questions about the certainty of the DNA results went to the weight of the evidence and not its admissibility.

{¶ 227} Despite some discrepancies, the jury accepted the testimony of the state's witnesses. Furthermore, a review of the entire record shows that the testimony was neither inherently unreliable nor unbelievable. Therefore, witness testimony, circumstantial evidence, and forensic evidence provided sufficient evidence to prove beyond a reasonable doubt that Lang was guilty of the R.C. 2929.04(A)(7) specifications.

{¶ 228} Although Lang does not raise the point, we note that Foster provided conflicting testimony about the DNA evidence found on the handgun. Foster testified that Lang could not be excluded as a possible minor source of DNA. Foster then testified that the chance of finding the major DNA profile that

was found on the pistol is 1 in 3,461. Foster also testified that there was a minor contributor to the DNA but "[t]here wasn't enough there of that second person * * * to compare to anyone * * * [and] we couldn't say anything about that minor person that was present." Thus, Foster's testimony that there was insufficient DNA to identify the minor contributor is inconsistent with her testimony that Lang could not be excluded as a possible minor source of the DNA that was found.

{¶ 229} It is apparent from the context of Foster's testimony that she misspoke about Lang's DNA. It appears that Foster meant to say that Lang could not be excluded as a possible major source rather than a minor source of DNA found on the handgun.

{¶ 230} Even discounting Foster's testimony, sufficient evidence was presented to prove beyond a reasonable doubt that Lang is guilty of the aggravated murders as the principal offender. Walker's and Seery's testimony established that Lang was the principal offender. The murder weapon belonged to Lang, and the police found it in the back of the car that Lang was driving. Moreover, the presence of Lang's DNA on the handgun was not crucial to the state's case, because it was Lang's handgun, and his DNA could be expected to be found on it. Accordingly, the jury could have found Lang guilty of Specification Three of Counts One and Two without the DNA testimony.

{¶ 231} With respect to Lang's manifest-weight challenges, this is not an "'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin*, 20 Ohio App.3d at 175, 20 OBR 215, 485 N.E.2d 717. Lang's challenge to the credibility of Walker's and Seery's testimony is unpersuasive. Thus, the jury neither lost its way nor created a manifest miscarriage of justice in convicting Lang of Specification Three of Counts One and Two.

{¶ 232} Based on the foregoing, we overrule proposition V.

***Penalty-Phase Issues***

**{¶ 233}** *Victim-impact testimony and readmission of guilt-phase evidence.* In proposition of law XV, Lang argues that the trial court erred by admitting victim-impact testimony from the victims' siblings in thepenalty phase of the trial. Lang also argues that the trial court erred in readmitting guilt-phase evidence during the penalty phase.

**{¶ 234}** 1. Victim-impact testimony. The trial court, over defense objection, allowed LaShonda Burditte, the sister of Jaron, and Rashu Jeffries, the brother of Cheek, to testify about the victims.

**{¶ 235}** LaShonda briefly discussed Jaron's early life, his schooling, his Navy enlistment, and his work record. LaShonda testified that Jaron married and had two daughters. She mentioned that Jaron was charged with possession of cocaine in 2005 and was sent to a halfway house, and he later lived with LaShonda. She also testified that Jaron and Cheek met in June 2006, and Jaron was 32 years old when he was killed.

**{¶ 236}** Rashu testified that Cheek was raised in Canton and was one of four children. He stated that Cheek graduated from Canton McKinley High School and was the mascot for the band. Rashu mentioned that Cheek married when she was 18 years old, and she had two children. Rashu also discussed Cheek's employment history and stated that she was 40 years old when she was killed.

**{¶ 237}** Victim-impact testimony does not violate constitutional guarantees. See *Payne v. Tennessee* (1991), 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720. This court has permitted victim-impact testimony in limited situations in capital cases when the testimony is not overly emotional or directed to the penalty to be imposed. See *Hartman*, 93 Ohio St.3d at 292, 754 N.E.2d 1150. In *Hartman*, the victim's mother briefly discussed the victim's early life, her schooling, her close-knit family, and the victim's contact with her family after

she moved from North Carolina to Ohio. Id. The witness also testified, "[I]t has been an extremely bad time for us and will be from now on. She'll never leave our heart." Id.

{¶ 238} Like the testimony in *Hartman*, LaShonda's and Rashu's testimony was not overly emotional. Both witnesses briefly summarized the victims' lives, their schooling, their marriages and children, and their work history. Neither witness mentioned the effect that the victim's death had on their families. Moreover, neither witness mentioned or recommended a possible sentence.

{¶ 239} Lang cites *State v. White* (1999), 85 Ohio St.3d 433, 446, 709 N.E.2d 140, in arguing that the victim-impact testimony was improper. *White* held that victim-impact testimony about the impact on *victims of noncapital crimes* in a capital-murder case was improper. Id. at 446-447. Unlike the testimony in *White*, victim-impact testimony presented during Lang's trial addressed the impact on only the victims of capital crimes. Lang's reliance on *White* is rejected. Thus, the trial court did not abuse its discretion in admitting the limited victim-impact testimony.

{¶ 240} 2. Readmission of guilt-phase evidence. At the start of the penalty phase, the trial court, over defense objection, readmitted the handgun and the swab of the grip, trigger, and slide area of the handgun, Lang's police statement, two spent cartridges, one spent bullet, a photograph of the victims as they were found in the Durango, and the coroner's photographs and autopsy reports.

{¶ 241} R.C. 2929.03(D)(1) provides that the prosecutor at the penalty stage of a capital proceeding may introduce "any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing." See *State v. DePew*, 38 Ohio St.3d 275, 528 N.E.2d 542, paragraph one of the syllabus. The trial court did not abuse its discretion in readmitting this

evidence because these items bore some relevance to the nature and circumstances surrounding the R.C. 2929.04(A)(5) and (A)(7) specifications.

{¶ 242} Based on the foregoing, proposition XV is overruled.

{¶ 243} *Instructions.* In proposition of law XIV, Lang argues that that the trial court's improper instructions rendered the jury's penalty-phase verdict unreliable.

{¶ 244} 1. Instructions on mitigating factors. During jury selection, the trial court advised the first group of prospective jurors, "If the State proved that the specific aggravating circumstance outweighed *any of the mitigating factors*, then you would have to, the law would require you to consider and to in fact order the death penalty." (Emphasis added.) The trial court provided similar instructions to subsequent groups of prospective jurors.

{¶ 245} Lang argues that the trial court's failure to advise the prospective jurors that they must weigh the mitigating factors collectively was improper and prejudicial. However, Lang's failure to object to these instructions waived all but plain error. *Underwood*, 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus.

{¶ 246} The trial court's voir dire instructions were incorrect. "The law requires that the mitigating factors be considered collectively, not individually." *State v. Fears* (1999), 86 Ohio St.3d 329, 345, 715 N.E.2d 136. However, the trial court's penalty-phase instructions properly advised the jurors of the correct standard for considering the mitigating factors. "[T]he judge's shorthand references to legal concepts during voir dire cannot be equated to final instructions given shortly before the jury's penalty deliberations." *State v. Stallings* (2000), 89 Ohio St.3d 280, 285, 731 N.E.2d 159. Thus, the trial court's penalty-phase instructions cured its earlier misstatements. See *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 147. No plain error occurred.

**{¶ 247}** 2. Instructions on consideration of guilt-phase evidence. During penalty-phase instructions, the trial court advised the jury:

**{¶ 248}** "Some of the evidence and testimony that you considered in the trial phase of this case may not be considered in this sentencing phase. We went through the exhibits. I've culled out only certain exhibits that will be with you in the jury room.

**{¶ 249}** "For purposes of this proceeding, only that evidence admitted in the trial phase that is relevant to the aggravating circumstances and to any of the mitigating factors is to be considered by you. You will also consider all of the evidence admitted during the sentencing phase."

**{¶ 250}** Lang argues that the instructions improperly allowed the jury to determine which guilt-phase evidence was relevant to the aggravating circumstances during the penalty phase. However, defense counsel failed to object to this instruction and waived all but plain error. *Underwood*, 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. Neither plain error nor any other error occurred.

**{¶ 251}** It is the trial court's responsibility to determine what guilt-phase evidence is relevant in the penalty phase. See *State v. Getsy* (1998), 84 Ohio St.3d 180, 201, 702 N.E.2d 866. Here, the trial court's instructions on relevancy limited the jury's consideration of the guilt-phase evidence and testimony to the two aggravating circumstances and the mitigating factors. The trial court's instructions also made it clear that the jury would see only those guilt-phase exhibits that the trial judge admitted and deemed relevant. Viewing the penalty-phase instructions as a whole, we conclude that the trial court adequately guided the jury as to the evidence to consider in the penalty phase. Proposition XIV is overruled.

**{¶ 252}** *Prosecutorial misconduct.* In proposition of law XII, Lang argues that the prosecutor committed misconduct during the penalty-phase proceedings.

However, defense counsel's failure to object waived all but plain error. *Childs*, 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus.

{¶ 253} First, Lang argues that the prosecutor misrepresented the evidence during final argument by stating, "We know now that Eddie was born in Baltimore, Maryland, that *until the age of 10 life seemed to be pretty good*." (Emphasis added.) Lang argues that this argument mischaracterized the evidence because Yahnena Robinson, Lang's half-sister, testified, "A lot of times my mother didn't let him [Lang's father] come" to see Lang. Lang argues that Robinson's testimony shows that he did not have a good or normal childhood.

{¶ 254} Other testimony supported the prosecutor's argument. Robinson also testified, "We had a typical brother sister relationship. We would watch movies and play school, other things that an older sister do [sic] with a younger brother we shared and did" before Lang was ten. Thus, the prosecutor's argument represented fair comment. No plain error occurred.

{¶ 255} Second, Lang argues that the prosecutor misstated the evidence in arguing that the trauma he suffered while living with his father for two years was not supported by the evidence. Robinson and Tracy Carter, Lang's mother, testified about the trauma Lang suffered during the two years that he lived with his father and the counseling and psychiatric treatment that Lang received for this trauma after returning home.

{¶ 256} During rebuttal argument, the prosecutor stated that the jury could discount testimony from Lang's mother and sister about Lang's trauma. The prosecutor argued, "[I]t is all speculation as to what happened in that two-year period of time. Nobody knows. But they want you to speculate that bad things happened when there is *absolutely no evidence* of that." (Emphasis added.)

{¶ 257} The prosecutor's argument mischaracterized the evidence because Robinson's and Carter's testimony constituted evidence of what happened to

Lang when he lived with his father. Nevertheless, when viewed in its entirety, the prosecutor's misstatement did not contribute unfairly to the death verdict and did not create outcome-determinative plain error. See *Bey*, 85 Ohio St.3d at 497, 709 N.E.2d 484.

{¶ 258} Third, Lang argues that the prosecutor improperly faulted him for not taking his medications as a child. Lang complains that the prosecutor argued, "And we know that his mother on numerous occasions sought help for Eddie, but Eddie didn't take his medication."

{¶ 259} During final argument, the prosecutor mentioned Lang's failure to take his medications while summarizing the mitigating testimony. The prosecutor's argument followed Carter's testimony that Lang took medication for depression and other psychiatric or behavioral problems before and after he lived with his father. But she also stated that Eddie "did not take it all the time."

{¶ 260} Lang contends that the prosecutor's argument improperly criticized his struggle with mental health and turned a mitigating factor into an aggravating circumstance. Review of the state's argument in its entirety shows that the prosecutor's argument about Lang's medications was an isolated remark that did not convey the improper meaning that Lang suggests. See *State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 89. Indeed, isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning. *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 646-647, 94 S.Ct. 1868, 40 L.Ed.2d 431. Moreover, the court's instructions clearly described the aggravating circumstances that the jury was to consider during deliberations. No plain error occurred.

{¶ 261} Fourth, Lang argues that the prosecutor committed misconduct by referring to him by the nickname "Tek" during the penalty-phase opening statements. During the state's opening statement, the prosecutor advised the jurors of the aggravating circumstances: "The first is that Eddie Lang, also known

as Tek, committed the offense of * * *." The prosecutor repeated the reference to Lang's nickname in advising the jury about the second aggravating circumstance. The prosecutor also completed his opening statement by stating, "Based upon that I submit that * * * two sentences of death shall by [sic] pronounced against Eddie Lang, also known as Tek * * *."

{¶ 262} Lang argues that the prosecutor's reference to his nickname was an improper attempt to associate him with gangs and violence. As discussed in proposition VIII, no testimony was introduced explaining the meaning of Lang's nickname. Thus, Lang's claim that the prosecutor was trying to paint him as a gang member is speculative. Nevertheless, the prosecutor's use of Lang's nickname was unnecessary and may have been an attempt to impugn his character. But the prosecutor did not repeat Lang's nickname during the remainder of the penalty-phase proceedings. Although error, the prosecutor's brief remarks do not rise to the level of outcome-determinative plain error.

{¶ 263} Fifth, Lang argues that the prosecutor committed misconduct by improperly making a victim-impact comment during the state's closing argument. Lang complains that the prosecutor argued, "We know that Eddie has a child just like Jaron and Marnell." Lang argues that the prosecutor's comments about the victims' children were made only to enhance the enormity of the crime. In the alternative, Lang argues that the prosecutor's statement about kids "just like Jaron and Marnell" presented the argument that the two victims had once been children too.

{¶ 264} The prosecutor's isolated remarks about the victims' children were made while summing up the mitigating evidence. "Merely mentioning the personal situation of the victim's family, without more, does not constitute misconduct." *State v. Goodwin* (1999), 84 Ohio St.3d 331, 339, 703 N.E.2d 1251. The prosecutor's brief remarks did not result in plain error. Moreover, Lang's alternative argument is speculative and lacks merit.

{¶ 265} Finally, Lang argues that the prosecutor committed misconduct during closing argument by arguing that the jurors should "render justice" and impose a sentence of death.

{¶ 266} "There is nothing inherently erroneous in calling for justice * * *." *State v. Evans* (1992), 63 Ohio St.3d 231, 240, 586 N.E.2d 1042. The prosecutor's argument was within the creative latitude afforded both parties in closing arguments. See *Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 311. No plain error occurred.

{¶ 267} Based on the foregoing, proposition XII is rejected.

{¶ 268} *Ineffective assistance of counsel.* In proposition of law XIII, Lang argues that his counsel provided ineffective assistance on multiple occasions during the penalty phase.

{¶ 269} First, he argues that his counsel failed to offer evidence of Cheek's involvement in Burditte's criminal activities to show that Cheek "induced or facilitated" the offense.

{¶ 270} Inducing or facilitating the offense is a statutory mitigating factor. See R.C. 2929.04(B)(1). Lang argues that his counsel should have established the existence of this factor by presenting evidence showing that Cheek was Burditte's girlfriend and knew that Burditte had planned to sell drugs on the night of the murders, because Burditte was found with a package of cocaine in his hand.

{¶ 271} No evidence was presented showing that Cheek was involved with the drug sale on the night of the murders. The fact that Cheek was sitting in the front seat with Burditte at the time of the drug sale is not sufficient to establish her involvement or show that she "induced or facilitated" the offense. R.C. 2929.04(B)(1); see *Williams*, 79 Ohio St.3d at 18, 679 N.E.2d 646. Moreover, Lang's assertion that his counsel should have presented evidence of Cheek's involvement in Burditte's other criminal activities is not well founded, because

nothing shows that such evidence existed. Thus, this is a speculative claim and it lacks merit.

{¶ 272} Even if such evidence did exist, the presentation of testimony suggesting that Cheek induced or facilitated her own murder might have backfired on the defense. The jury might have viewed trial counsel's attempt to present such evidence as unnecessarily attacking Cheek's character. Thus, counsel were not ineffective by failing to offer evidence suggesting that Cheek induced or facilitated the offense.

{¶ 273} Second, Lang argues that his counsel failed to fully investigate, prepare, and present mitigating evidence.

{¶ 274} The presentation of mitigating evidence is a matter of "trial strategy." *Keith*, 79 Ohio St.3d at 530, 684 N.E.2d 47. " 'Moreover, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." ' " *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 189, quoting *Wiggins v. Smith* (2003), 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471, quoting *Strickland*, 466 U.S. at 690-691, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 275} Lang claims that his counsel were deficient because they failed to collect and present his medical records, school records, police records, and social-service records to corroborate the mitigation testimony of Carter and Robinson.

{¶ 276} Defense counsel employed a mitigation expert, a psychologist, and a criminal investigator in preparing for trial. Each of these individuals began working on Lang's case several months before the penalty phase. The defense also requested records about Lang from the Department of Social Services in Baltimore, Maryland, which was Lang's childhood home. Thus, the record shows that defense counsel thoroughly prepared for the penalty phase of the trial.

{¶ 277} The record does not show why this documentary evidence was not introduced into evidence. But Carter and Robinson provided lengthy testimony

about Lang's background, his father's abuse, and the mental-health problems Lang suffered before and after living with his father for two years. Counsel's decision to rely solely on Carter's and Robinson's testimony constituted a tactical choice and not ineffective assistance of counsel. See *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 241.

{¶ 278} Additionally, Lang claims that his counsel failed to present a psychologist as a witness to explain the impact of his childhood abuse, his abduction by his father, and the failure to take medications. Dr. Jeffrey Smalldon, a clinical psychologist employed by the defense, interviewed and performed psychological testing on Lang and also interviewed Lang's mother and half-sister. Lang's claim that Dr. Smalldon would have provided important mitigating evidence on his behalf is speculative at best, and counsel's decision not to call Dr. Smalldon as a witness was a tactical choice as part of a trial strategy.

{¶ 279} Third, Lang argues that his counsel misrepresented the evidence during closing argument by telling the jury, "You learned that [Lang] had siblings, that * * * like the prosecutor said, *pretty normal childhood up until he was ten*." (Emphasis added.) Lang argues that counsel's argument misrepresented the evidence about his childhood and was prejudicial.

{¶ 280} Defense counsel's argument did not misrepresent the evidence. Carter testified that Lang did not meet his abusive father until he was ten years old. As discussed in proposition XII, Robinson also testified that before Lang was ten years old, they "had a typical brother sister relationship."

{¶ 281} Counsel's argument also maintained defense credibility and allowed the defense to focus the jury's attention on defense counsel's argument that addressed Lang's abuse after his father abducted him. Thus, counsel's characterization of Lang's early childhood did not result in ineffective assistance of counsel. See *State v. Jones* (2001), 91 Ohio St.3d 335, 356-357, 744 N.E.2d 1163.

{¶ 282} Fourth, Lang argues that his counsel were ineffective by failing to present evidence to the jury that they promised to present during the opening statements.

{¶ 283} Lang claims that his counsel broke his promise to present evidence showing that he grew up in "one of the most dangerous" neighborhoods in Baltimore. However, counsel did not make a direct promise that he would present such evidence. Rather, trial counsel told the jury, "[Y]ou will *probably* hear the neighborhood is now known as one of the most dangerous ones in the State of Maryland." (Emphasis added.) Thus, Lang has failed to show that his counsel broke such a promise to the jury.

{¶ 284} Lang also argues that his counsel broke a promise to present testimony that he suffered from thoughts of suicide. During opening statements, defense counsel stated that Lang was a "different person" after he returned home following his abduction. Counsel also stated, "You'll hear about Eddie's thoughts of suicide."

{¶ 285} Defense counsel presented no evidence during the mitigation case that Lang had considered suicide. Thus, counsel were deficient in failing to keep this promise. But Lang has not established that this deficiency was prejudicial. See *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. He merely speculates that such an omission caused the defense to lose credibility and weakened the overall defense case. Accordingly, this claim is rejected.

{¶ 286} Fifth, Lang argues that counsel were ineffective by failing to object to prosecutorial misconduct, instructions, and rulings of the trial court. But none of these claims has any merit. As discussed in other propositions, counsel were not ineffective by failing to object to prosecutorial misconduct (proposition XII) or to the court's instruction on reasonable doubt (proposition XX). Counsel were also not ineffective by failing to object to the trial court's instructions on the

consideration of trial-phase evidence during the penalty phase (proposition XIV) or the imposition of court costs (proposition XIX).

{¶ 287} Finally, Lang argues that the cumulative effect of counsel's errors and omissions resulted in ineffective assistance of counsel. However, the record shows that Lang received a fair trial, and any error was nonprejudicial.

{¶ 288} Based on the foregoing, proposition XIII is rejected.

{¶ 289} *Arbitrary sentencing*. In proposition of law XI, Lang argues that his death sentence for Cheek's murder should be vacated because the jury's sentencing recommendations — life for Burditte's murder (Count One) and death for Cheek's murder (Count Two) — are arbitrary. Lang contends that the disparity in sentencing occurred because Burditte was a drug dealer and Cheek was not. Consequently, Lang argues, the jury improperly considered the victim's status as an aggravating circumstance in reaching its death verdict.

{¶ 290} We reject Lang's argument. The jury verdicts are not inconsistent. The jury was required to "consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense." R.C. 2929.04(B); see *Wogenstahl*, 75 Ohio St.3d at 355, 662 N.E.2d 311. Here, the nature and circumstances of the offense showed that Burditte was involved in selling illegal drugs to Lang at the time of his murder. There was no evidence showing that Cheek was involved. In weighing the nature and circumstances of the offense, the jurors might have determined that Burditte's murder was mitigated because of Burditte's involvement in the events leading up to his murder. On the other hand, the jury might have decided that Lang's murder of Cheek was not mitigated at all. See *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 139.

{¶ 291} Moreover, it is not for an appellate court to speculate about why a jury decided as it did. *State v. Lovejoy* (1997), 79 Ohio St.3d 440, 445, 683 N.E.2d 1112. " 'Courts have always resisted inquiring into a jury's thought

processes * * *; through this deference the jury brings to the criminal process, in addition to the collective judgment of the community, an element of needed finality.' " Id*., quoting *United States v. Powell* (1984), 469 U.S. 57, 66-67, 105 S.Ct. 471, 83 L.Ed.2d 461.

**{¶ 292}** Additionally, we reject Lang's claim that the jurors improperly considered Burditte's status as a drug dealer as an aggravating circumstance. The trial court properly instructed the jury on the aggravating circumstances that they could consider during their deliberations. The trial court's instructions included the admonition, "The aggravated murder itself is not an aggravating circumstance. You may only consider the aggravating circumstances that were just described to you and which accompanied the aggravated murder." It is presumed that the jury followed the trial court's instructions. See, e.g., *State v. Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, ¶ 90. Based on the foregoing, we overrule proposition XI.

### *Remaining Issues*

**{¶ 293}** *Settled issues.* In proposition of law XX, Lang challenges the constitutionality of the instructions on reasonable doubt during both phases of the trial. However, we have already affirmed the constitutionality of the "reasonable doubt" definition provided by R.C. 2901.05. See *State v. Jones* (2001), 91 Ohio St.3d 335, 347, 744 N.E.2d 1163.

**{¶ 294}** In proposition of law XXI, Lang attacks the constitutionality of Ohio's death-penalty statutes. This claim is summarily rejected. See *State v. Carter* (2000), 89 Ohio St.3d 593, 607, 734 N.E.2d 345; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph one of the syllabus.

**{¶ 295}** Lang also argues that Ohio's death-penalty statutes violate international law and agreements to which the United States is a party. We also reject this argument. See *State v. Issa* (2001), 93 Ohio St.3d 49, 69, 752 N.E.2d 904; *Bey*, 85 Ohio St.3d at 502, 709 N.E.2d 484.

**{¶ 296}** *Sentencing opinion.* In proposition of law XVII, Lang asserts that there are numerous flaws in the trial court's sentencing opinion.

**{¶ 297}** First, Lang argues that the trial court improperly concluded that Cheek was not involved in the drug deal. In summarizing the evidence, the trial court stated, "[T]here is no evidence to suggest that Marnell Cheek was a participant in the drug transaction. All evidence points to the fact that she was a person riding in the vehicle at the wrong place and at the wrong time." The trial court's conclusion represented a fair assessment of the evidence. Thus, there was no error.

**{¶ 298}** Second, Lang contends that the court erroneously sentenced him to death because nothing in the record supports imposing the death sentence for Cheek's murder and a life sentence for Burditte's murder. The court's sentencing opinion analyzed the aggravating circumstances, identified the mitigating factors found to exist, and fully explained why the aggravating circumstances outweighed the mitigating factors as R.C. 2929.03(F) requires. But the trial court was not required to address the propriety of Lang's death sentence in view of the life sentence that Lang received for Burditte's murder. Moreover, our independent review of the sentence will cure any flaws in the trial court's opinion. *State v. Fox* (1994), 69 Ohio St.3d 183, 191, 631 N.E.2d 124.

**{¶ 299}** Third, Lang argues that the trial court did not properly consider his youth as a mitigating factor and erroneously concluded that "his conduct and taped statement show a street-hard individual." The "assessment and weight to be given mitigating evidence are matters for the trial court's determination." *State v. Lott* (1990), 51 Ohio St.3d 160, 171, 555 N.E.2d 293. Here, the trial court identified Lang's youth (he was 19 at the time of the offense) as his strongest mitigating factor and fully discussed the weight it was giving to this mitigation. The trial court could reasonably assign minimal weight to this evidence. See *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 103.

{¶ 300} Fourth, Lang claims that the trial court improperly considered the nature and circumstances of the offense even though the defense never raised it as a mitigating factor. Lang also argues that the trial court's finding that there was nothing mitigating in the nature and circumstances of the offense transformed them into an aggravating factor.

{¶ 301} The trial court did not err in considering the nature and circumstances of the offense. R.C. 2929.04(B) provides that the court, in determining whether death is an appropriate penalty, "*shall consider*, and weigh against the aggravating circumstances proved beyond a reasonable doubt, *the nature and circumstances of the offense*." (Emphasis added.) Accordingly, the trial court was required to review these factors. See *State v. Steffen* (1987), 31 Ohio St.3d 111, 116-117, 31 OBR 273, 509 N.E.2d 383. Nothing, however, in the sentencing opinion indicates that the trial court viewed the nature and circumstances of the offense as an aggravating circumstance rather than a mitigating factor.

{¶ 302} Finally, Lang argues that the trial court trivialized mitigating evidence about his history, character, and background. Lang claims that the trial court glossed over testimony about his father's abusive relationship with his mother, failed to fully consider the mental and psychological abuse he suffered after being abducted by his father, and faulted him for not always taking his medications.

{¶ 303} Nothing in the sentencing opinion indicates that the trial court trivialized or glossed over mitigating evidence. The trial court thoroughly discussed mitigating evidence about his father's abuse, mentioned that Lang was treated at various psychiatric facilities on over 30 occasions, and properly summarized evidence that Lang did not always take his medications. The trial court also stated that it had "weighed all of the evidence presented as it relates to Mr. Lang's history, character, and background." Thus, this claim also lacks merit.

**{¶ 304}** Based on the foregoing, proposition XVII is overruled.

**{¶ 305}** *Imposition of court costs.* The trial court assessed Lang with court costs. In proposition of law XIX, Lang argues that the trial court's imposition of court costs on him, an indigent defendant, "violates the spirit of the Eighth Amendment." But Lang's failure to object has waived this issue. See *State v. Threatt*, 108 Ohio St.3d 277, 2006-Ohio-905, 843 N.E.2d 164, ¶ 23 (motion to waive costs must be made at time of sentencing to preserve issue for appeal).

**{¶ 306}** Costs may be assessed against and collected from indigent defendants. *State v. White*, 103 Ohio St.3d 580, 2004-Ohio-5989, 817 N.E.2d 393, paragraphs one and two of the syllabus. Lang cites no authority for his "spirit-of-the-Eighth-Amendment" claim. Thus, no plain error occurred. See *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 245 (upholding imposition of costs on convicted capital defendant). Proposition XIX is rejected.

**{¶ 307}** *Errors in imposition of postrelease control.* In proposition of law XXII, Lang argues that the trial court failed to properly impose postrelease control on him as part of his sentence for the aggravated robbery.

**{¶ 308}** Based upon his conviction for aggravated robbery, a first-degree felony, R.C. 2911.01(C), the trial court imposed five years of postrelease control. See R.C. 2967.28(B)(1). However, the trial court failed to specify that if Lang violated his supervision or a condition of postrelease control, the parole board could impose a maximum prison term of up to one-half of the prison term originally imposed. See R.C. 2929.19(B)(3)(e). The trial court's judgment entry also failed to properly state the length of confinement that could be imposed for a violation of postrelease control.

**{¶ 309}** Because the trial court failed to properly impose postrelease control, we remand this case so that the trial court may impose the proper terms of

postrelease control and correct the judgment entry. See *State v. Ketterer*, 126 Ohio St.3d 448, 2010-Ohio-3831, 935 N.E.2d 9, ¶ 77-79; *Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 214. The trial court should follow the procedures set forth in R.C. 2929.191(C) because Lang's sentencing occurred after July 11, 2006. See *State v. Singleton*, 124 Ohio St.3d 173, 2009-Ohio-6434, 920 N.E.2d 958, paragraph two of the syllabus.

{¶ 310} *Cumulative error.* In proposition of law XVIII, Lang argues that cumulative errors during both phases of the proceedings deprived him of a fair trial. However, Lang was not prejudiced by any error at his trial. Thus, proposition XVIII is rejected.

{¶ 311} *Appropriateness of death sentence.* In proposition of law XVI, Lang argues that the death penalty is not appropriate because of the compelling mitigating evidence presented in his behalf. These arguments will be addressed during our independent sentence evaluation.

## INDEPENDENT SENTENCE EVALUATION

{¶ 312} Having completed our review of Lang's propositions of law, we are required by R.C. 2929.05(A) to independently review Lang's death sentence for appropriateness and proportionality.

{¶ 313} *Aggravating circumstances.* The evidence at trial established beyond a reasonable doubt that Lang murdered Marnell Cheek as part of a course of conduct involving the purposeful killing of two or more people, R.C. 2929.04(A)(5). The evidence also established beyond a reasonable doubt that Lang murdered Cheek during an aggravated robbery and that he was the principal offender in the commission of the aggravated murder, R.C. 2929.04(A)(7).

{¶ 314} *Mitigating evidence.* Against these aggravating circumstances, we are called upon to weigh the mitigating factors contained in R.C. 2929.04(B). Lang presented two mitigating witnesses.

{¶ 315} Yahnena Robinson, the defendant's half-sister, had a close relationship with Lang before he was ten years old. She described it as a "typical brother sister relationship." Lang was also a "good student."

{¶ 316} Robinson testified that Lang's father, Edward Lang Sr., abused their mother and was on drugs. Their mother would not allow Edward to visit Lang very often because of "his history and his anger problems."

{¶ 317} After Lang graduated from elementary school, Lang visited his father in Delaware. The visit was supposed to last for two weeks, but Edward did not allow Lang to return home. Two years later, their mother found Lang and brought him home.

{¶ 318} Lang was happy when he first came home, but later, his mood changed. According to Robinson, "he would be sad sometimes, quiet * * * [and] other times he would look real hurt or be angry." Subsequently, Lang received counseling, went to a psychiatric facility, and spent time in a residential facility for his mental-health problems.

{¶ 319} Robinson also testified that Lang has a two-year-old daughter whose name is Kanela Lang.

{¶ 320} Tracy Carter, the defendant's mother, testified that Lang is the third of her four children. Carter met Edward Lang Sr. when he was her landlord. Carter did not have money to pay the rent, and she slept with him in exchange for lodging. Carter and Edward then developed a relationship.

{¶ 321} Carter stated that Edward became violently abusive when he was intoxicated and using drugs. After Lang was born, Edward went to jail for stabbing Carter and setting her apartment on fire. Edward was also incarcerated for child molestation.

{¶ 322} Carter would not allow Lang to visit his father until a court order ordered her to do so. Carter lived in Baltimore, Maryland, and Edward lived in Delaware. When he was ten years old, Lang went to see his father in Delaware

for a two-week visit. However, Edward did not allow Lang to return home after the two weeks ended, and Carter did not see her son for the next two years. Carter made repeated attempts to find Lang in Delaware, but was unsuccessful. Finally, Carter found Lang and brought him home.

{¶ 323} Carter stated that her son was malnourished when she found him and was wearing the same clothing that he had been wearing when he left. Lang also had a burn on his shoulder, a gash on his hand, and other bruises. Lang told his mother that the burn was a cigarette burn.

{¶ 324} Before he saw his father, Lang had been treated with Depakote, Lithium, and Risperdal for depression and other conditions. Carter made sure that he took these medications on a regular basis. However, Lang did not continue to take them when he was with his father, because Edward did not obtain refills for the prescriptions.

{¶ 325} After returning home, Lang was withdrawn. Lang told Carter that he was fine and did not want to talk to her about what had happened. But Carter learned from her son, Mendez, that Edward had sexually abused Lang.

{¶ 326} Lang has received extensive psychiatric and other treatment. Carter testified, "He stayed in the Bridges Program twice for 90 days. He stayed at Woodburn Respiratory Treatment Center for a year. And he stayed off and on at * * * [the] Sheppard Pratt Center [a crisis center] 28 times."

{¶ 327} Lang has one child, Kanela. Carter states, "He has taken care of his daughter ever since the mother was pregnant. * * * [There] was nothing that he wouldn't do for her and for the baby."

{¶ 328} Lang did not finish high school. He dropped out of the 11th grade and "went to take care of his baby's mother." Lang got a job working for the census department. In June 2006, Lang moved to Canton.

**{¶ 329}** As a final matter, Carter told the jury, "We all are suffering. * * * I never sat here and said my son was a perfect child. I never sat here and said that my child had a good life or a bad life. But I am asking you not to kill my child."

### Sentence evaluation

**{¶ 330}** We find nothing mitigating in the nature and circumstances of the offense. Lang brutally murdered Marnell Cheek during an attempted robbery of Jaron Burditte, a drug dealer. Cheek's murder was part of a course of conduct during which Lang also murdered Burditte.

**{¶ 331}** Although Lang's character offers nothing in mitigation, we give some weight to Lang's history and background. Lang was abused by his father during his childhood. He was also malnourished and physically abused during the two years that he stayed with his father. Moreover, Lang required extensive counseling and psychiatric treatment after returning home to his mother. Nevertheless, there is no evidence of any connection between Lang's abusive treatment and the two murders. See, e.g., *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 265 (decisive weight seldom given to defendants with unstable childhoods).

**{¶ 332}** Lang argues that his history of substance abuse deserves mitigating weight. However, nothing in the record shows that Lang had such a history.

**{¶ 333}** The statutory mitigating factors under R.C. 2929.04 include (B)(1) (victim inducement), (B)(2) (duress, coercion, or strong provocation), (B)(3) (mental disease or defect), (B)(4) (youth of the offender), (B)(5) (lack of a significant criminal record), (B)(6) (accomplice only), and (B)(7) (any other relevant factors). We find that the R.C. 2929.04(B)(2), (B)(5), and (B)(6) factors are inapplicable here.

**{¶ 334}** The R.C. 2929.04(B)(1) factor would apply only to the course-of-conduct specification because Lang was sentenced to death for Cheek's murder.

However, we give no weight to the (B)(1) factor, because Burditte's participation in the drug sale does not mean that he "induced or facilitated" the murders. Id. "While participation in criminal activity certainly carries with it an element of serious risk, the unlawful taking of a human life cannot be deemed less serious simply because the victim was involved in unlawful activity." *Williams*, 79 Ohio St.3d at 18, 679 N.E.2d 646.

{¶ 335} We also find that the R.C. 2929.04(B)(3) factor is not applicable because no evidence was presented showing that "at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law."

{¶ 336} However, we give some weight to Lang's mental problems under the catchall provision, R.C. 2929.04(B)(7). Testimony showed that Lang suffered from depression and received extensive psychological and psychiatric treatment. But again, there was no evidence of any significant connection between Lang's mental illness and the murders.

{¶ 337} We give significant weight to Lang's youth pursuant to R.C. 2929.04(B)(4). Lang was a few days older than 19 when the offenses occurred. However, we have upheld the death penalty in other cases in which the defendant committed aggravated murder at Lang's age or younger. See *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 203 (age 18); *Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 149 (age 18); *Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 98 (age 18); and *Slagle*, 65 Ohio St.3d at 613, 605 N.E.2d 916 (age 18).

{¶ 338} We also give weight as an R.C. 2929.04(B)(7) mitigating factor to evidence that Lang shares love and support with his mother and half-sister and has provided care to his young daughter and her mother.

**{¶ 339}** Finally, we reject Lang's argument that the disparity in sentencing between himself and Walker weighs in favor of sparing his life. The disparity in sentencing can be explained on the basis that Lang was the principal offender and Walker was not.

**{¶ 340}** Upon weighing the aggravating circumstances against the mitigating factors, we find that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. Lang's murder of Cheek during an aggravated robbery as the principal offender and his course of conduct in murdering Cheek and Burditte are grave aggravating circumstances. Lang's mitigating evidence pales in comparison to these aggravating circumstances.

**{¶ 341}** We also find that the penalty imposed in this case is not "excessive or disproportionate to the penalty imposed in similar cases." R.C. 2929.05(A). The penalty is proportionate to death sentences approved in cases for other robbery-murder cases. See *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 120 (two victims murdered in drug-related robbery); *State v. Jackson* (2001), 92 Ohio St.3d 436, 453, 751 N.E.2d 946 (two victims shot in back of the head during drug-related robbery); *State v. Palmer* (1997), 80 Ohio St.3d 543, 577, 687 N.E.2d 685 (two victims murdered and robbed). The penalty is also proportionate to death sentences approved for other course-of-conduct murders. *State v. Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, ¶ 140; *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 182; *State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 162.

## Conclusion

**{¶ 342}** We affirm the capital convictions, the conviction for aggravated robbery, the sentence of death, and the judgment of the trial court, but we remand for the trial court to impose the appropriate term of postrelease control pursuant to R.C. 2929.191.

Judgment accordingly.

O'CONNOR, C.J., and LANZINGER and CUPP, JJ., concur.

PFEIFER, LUNDBERG STRATTON, and MCGEE BROWN, JJ., concur separately.

———————————

**LUNDBERG STRATTON**, **J**., **concurring**.

{¶ 343} Lang brutally murdered two people during an attempted robbery of a drug dealer. In many respects, Lang is no more sympathetic than the defendant in *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, who brutally murdered a family friend. But I question their culpability because the two capital defendants share a common bond — mental illness. Ketterer suffered from bipolar disorder. Id. at ¶ 172. While Lang's defense never actually introduced documentation of his diagnoses, clearly, at a minimum, Lang suffered from depression as a child, evidenced by his prescriptions for Depakote, Lithium, and the antipsychotic medicine Risperdal, and as evidenced by his frequent stays in psychiatric facilities.

{¶ 344} In *Ketterer,* I wrote that I believed that the time had come to reexamine whether we as a society should administer the death penalty to a person with a serious mental illness. *Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 212 (Lundberg Stratton, J., concurring). Because I continue to adhere to that belief, I write separately, five years later, to continue to encourage our General Assembly to take up this critical issue.

### Facts

{¶ 345} Like Ketterer, Lang was seriously abused by his father as a child. Lang's parents met when his father was his mother's landlord. Lang's mother was a single parent and could not pay her rent. Lang's father traded her a place to live for sex. Lang's father was a drug addict who beat Lang's mother, even when she was pregnant. Eventually, Lang and his mother received a brief respite from

Lang's father when he was incarcerated for beating and stabbing Lang's mother and setting fire to their apartment. Lang's father also served time in prison for child molestation.

{¶ 346} The damage inflicted on Lang by this turbulent and violent childhood is probably best illustrated by what was in essence a kidnapping that he suffered at the hands of his father. At age ten, Lang went for a court-ordered two-week visit with his father out of state but was held by his father for two years. Lang's mother testified that after repeated, unsuccessful attempts to find her son, she found him two years later malnourished and emaciated, weighing about 88 pounds, and wearing the shirt and shoes he had left in. Despite its being December in Maryland, he had no coat or warm clothes. When Lang's mother took him to buy new clothes, she discovered that his body showed physical abuse. Lang had bruises, a gash on his hand, and an unmistakable cigarette burn on his back.

{¶ 347} Before he left to see his father, Lang had been treated for depression and was on three psychotropic drugs. During his forced stay with his father, Lang's father refused to obtain refills for Lang's medications. Not surprisingly, after two years apart from his mother, Lang was withdrawn when he returned home. He kept to himself and refused to discuss the ordeal or any of what had happened to him in those two years. For the next several years, Lang received extensive psychiatric treatment. Lang made 28 visits to Sheppard Pratt, a psychiatric facility, usually staying for two weeks at a time. Twice he spent 90 days at the Bridges Program. He spent a full year at Woodburn Respiratory Treatment Center. Lang's mother testified that her older son, Mendez, told her that Lang's father had sexually abused Lang.

{¶ 348} As both parties noted, the mitigation evidence was compelling, but unsupported. Two lay witnesses testified on Lang's behalf, but they did not present any documents, medical reports, or other evidence. Lang's half-sister and

mother testified about his turbulent family life, and his mother testified how Lang's father had kept him for two years without allowing her to see him. Both witnesses testified to, but did not provide any other evidence of, Lang's mental state. The state noted to the jury that both witnesses had ample reason to lie and that without any proof, the testimony should be dismissed as mere speculation. The defense hired Dr. Jeffrey Smalldon as its mitigation expert, but did not have him testify. It is of concern that Lang was repeatedly hospitalized for extensive psychiatric treatment over a period of years, yet no clear mental-health diagnosis appears in the record—symbolic of a failure of the system.

**Evolving Standards of Decency that**

**Mark the Progress of a Maturing Society**

{¶ 349} In *Ketterer*, as here, I noted that guilt is not at issue. *Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 228 (Lundberg Stratton, J., concurring). Also as in *Ketterer*, I am concurring rather than dissenting because the court's sentence of death is authorized under our current law. Id. But as in Ketterer, I continue to believe that we as a society should reexamine current law. Id.

{¶ 350} " 'The legislators who passed our current death penalty laws did not intend to force grotesque issues to the center stage of constitutional adjudication. The death penalty was supposed to be about getting even with Charles Manson and Ted Bundy, not executing teenagers and the retarded, or wrestling condemned schizophrenics to the gurney for forced doses of Haldol. But here we are.' " Mello, Executing the Mentally Ill (2007) 22 Crim.Just. 30, quoting David Bruck, a clinical professor of law and director of the Virginia Capital Case Clearinghouse at Washington and Lee University School of Law.

{¶ 351} "[T]hese questions go to the core of our legal system of death: Who, and why, do we execute? The problem of the intersection between mental

illness and capital punishment isn't rocket science. It's much harder than that." Id. at 31

**{¶ 352}** Two recent United States Supreme Court rulings barring execution of juvenile offenders and people with mental retardation seem to give hope that others with diminished capacity for judgment will also be spared the fate of a punishment that they may not even comprehend. Malone, Cruel and Inhumane: Executing the Mentally Ill, Amnesty International Magazine (Mar. 27, 2007) at http://amnestyusa.org/node/87240. Although neither court case addresses persons with mental illness, Victor Streib, an Ohio Northern University law professor, quoted 11 times by the United States Supreme Court in *Roper v. Simmons* (2005), 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1, notes, "If certain mentally ill defendants think and act like juveniles or the mentally retarded, then they should be excluded from death row." Id.

*Unconstitutionality of Executing Persons with*
*Mental Retardation/Developmental Disabilities*

**{¶ 353}** In 1989, the United States Supreme Court held that the Eighth Amendment to the United States Constitution did not mandate a categorical exemption from the death penalty for mentally retarded offenders.[3] *Penry v. Lynaugh* (1989), 492 U.S. 302, 335, 109 S.Ct. 2934, 106 L.Ed.2d 256. At the time, the court noted that only two states had enacted laws banning the imposition of the death penalty on a mentally retarded person convicted of a capital offense. Id. at 334. *Penry* held that those two state enactments, "even when added to the 14 States that have rejected capital punishment completely, do not provide sufficient evidence at present of a national consensus." Id.

---

3. This concurrence uses the term "mentally retarded" rather than the more recently acceptable term "persons with developmental disabilities," because the term "mentally retarded" has been consistently used by the United States Supreme Court and other courts and has a legal significance. *Penry*, 492 U.S. at 344, 109 S.Ct. 2934, 106 L.Ed.2d 256 (Brennan, J., concurring in part and dissenting in part).

{¶ 354} Thirteen years later, the court reconsidered the constitutionality of executing mentally retarded capital offenders. In *Atkins v. Virginia* (2002), 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335, the court noted that "standards of decency" had evolved since *Penry* and now demonstrate that the execution of the mentally retarded is cruel and unusual punishment. *Atkins* noted, "[I]n the 13 years since we decided *Penry* * * *, the American public, legislators, scholars, and judges have deliberated over the question whether the death penalty should ever be imposed on a mentally retarded criminal. The consensus reflected in those deliberations informs our answer to the question presented by this case." Id. at 307.

{¶ 355} *Atkins* noted the many state legislatures across the country since *Penry* that had begun to address the issue. Citing several states, the court held, "It is not so much the number of these States that is significant, but the consistency of the direction of change." Id. at 315. The court noted that when *Atkins* was decided, only a minority of states permitted the practice, and even in those states, it was rare. Id. at 314-315. Therefore, evolving standards of decency compelled the conclusion that execution of mentally retarded offenders "has become truly unusual and it is fair to say that a national consensus has developed against it." Id. at 316.

*Unconstitutionality of Executing Juveniles*

{¶ 356} Another category of persons whose eligibility for execution has rightly caused much consternation for the United States Supreme Court is juveniles. In *Stanford v. Kentucky* (1989), 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306, the court held that contemporary standards of decency in this country did not proscribe the execution of juvenile offenders who were over 15 but under 18 when they committed their crimes. Id. at 370-371. *Stanford* had noted that 22 of the 37 death-penalty states permitted the death penalty for 16-year-old offenders, and among those 37 states, 25 permitted it for those who had

offended at 17 years old. These numbers, in the court's view, indicated no national consensus "sufficient to label a particular punishment cruel and unusual." Id. at 371.

{¶ 357} Sixteen years later, the court reconsidered that issue and held that the Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed. *Roper,* 543 U.S. at 568, 125 S.Ct. 1183, 161 L.Ed.2d 1. The court noted, "The evidence of national consensus against the death penalty for juveniles is similar, and in some respects parallel, to the evidence *Atkins* held sufficient to demonstrate a national consensus against the death penalty for the mentally retarded. When *Atkins* was decided, 30 states prohibited the death penalty for the mentally retarded. This number comprised 12 that had abandoned the death penalty altogether, and 18 that maintained it but excluded the mentally retarded from its reach. By a similar calculation in this case, 30 States prohibit the juvenile death penalty, comprising 12 that have rejected the death penalty altogether and 18 that maintain it but, by express provision or judicial interpretation, exclude juveniles from its reach." (Citation omitted.) Id. at 564.

{¶ 358} Again, *Roper* noted the " 'consistency of the direction of change.'" Id. at 566, quoting *Atkins*, 536 U.S. at 315, 122 S.Ct. 2242, 153 L.Ed.2d 335. "As in *Atkins*, the objective indicia of consensus in this case—the rejection of the juvenile death penalty in the majority of States; the infrequency of its use even where it remains on the books; and the consistency in the trend toward abolition of the practice—provide sufficient evidence that today our society views juveniles, in the words *Atkins* used respecting the mentally retarded, as 'categorically less culpable than the average criminal.' " *Roper* at 567, 125 S.Ct. 1183, 161 L.Ed.2d 1, citing *Atkins* at 316.

## The Case for Banning Execution of
## Persons with Severe Mental Illness

**{¶ 359}** Although it is unconstitutional to execute someone who is incompetent at the time of his or her execution, see *Ford v. Wainwright* (1986), 477 U.S. 399, 417-418, 106 S.Ct. 2595, 91 L.Ed.2d 335, and *Panetti v. Quarterman* (2007), 551 U.S. 930, 934, 127 S.Ct. 2842, 168 L.Ed.2d 662, the United States Supreme Court has not yet decided whether it is unconstitutional to execute someone who suffered from a serious mental illness at the time of the crime. If executing persons with mental retardation/developmental disabilities or executing juveniles offends "evolving standards of decency," *Roper*, 543 U.S. at 563, 125 S.Ct. 1183, 161 L.Ed.2d 1, then I simply cannot comprehend why these same standards of decency have not yet evolved to also prohibit execution of persons with severe mental illness at the time of their crimes.

*Legislative Enactments and other Indications of our*

*Evolving Standards of Decency*

**{¶ 360}** Although not the groundswell noted in *Atkins* and *Roper,* since my concurrence in *Ketterer* in 2006, a few states have considered limiting the execution of those who were severely mentally ill at the time of the crime. Connecticut is the only state to prohibit execution of the mentally ill. Entzeroth, The Challenge and Dilemma of Charting a Course to Constitutionally Protect the Severely Mentally Ill Capital Defendant from the Death Penalty (2011), 44 Akron L.Rev. 529, 564. It exempts a capital defendant from execution if the jury or court finds that his or her "mental capacity was significantly impaired or the defendant's ability to conform the defendant's conduct to the requirements of law was significantly impaired but not so impaired in either case as to constitute a defense to prosecution." Conn.Gen.Stat.Ann. 53a-46(a).

**{¶ 361}** Using language from the American Bar Association's Recommendation 122A, legislators in Kentucky and North Carolina have introduced bills to bar the execution of defendants who, at the time of the offense, "had a severe mental disorder or disability that significantly impaired their

capacity to (a) appreciate the nature, consequences, or wrongfulness of their conduct, (b) exercise rational judgment in relation to conduct, or (c) conform their conduct to the requirements of the law." Kentucky H.B. No. 446, introduced in the 2009 regular session, and North Carolina H.B. 553/S.B. No. 1075 use nearly identical language.

{¶ 362} In addition, Indiana established the Bowser Commission to examine the execution of the mentally ill. The Bowser Commission issued a report in November 2007 recommending the exemption of the severely mentally ill from the death penalty. Final Report of the Bowser Commission, Indiana Legislative Services Agency, November 2007, http://www.in.gov/legislative/interim/committee/reports/BCOMAB1.pdf, p. 3. In 2009, Indiana's S.B. No. 22 was introduced to prohibit the imposition of the death penalty on an individual judicially determined to have had a severe mental illness, defined as schizophrenia, schizoaffective disorder, bipolar disorder, major depression, or delusional disorder, at the time of the crime. www.deathpenaltyinfo.org. See Entzeroth at 564.

{¶ 363} Finally, the Tennessee Disability Coalition reports that in 2011, Tennessee legislators introduced H. B. No. 2064 and S.B. No. 1692 to prohibit the execution of a person who had severe and persistent mental illness at the time of committing murder in the first degree. http://tn.disability.org.

{¶ 364} Moreover, at least five leading professional associations, the American Bar Association, the American Psychiatric Association, the American Psychological Association, the National Alliance on Mental Illness, and Mental Health America, have adopted policy statements recommending prohibition of execution of persons with severe mental illness at the time of the offense. Winick, The Supreme Court's Evolving Death Penalty Jurisprudence: Severe Mental Illness as the Next Frontier (2009), 50 B.C.L.Rev. 785, 789.

*The Crux of the Issue*

**{¶ 365}** Mental Health America estimates that five to ten percent of all death row inmates suffer from a severe mental illness. Mental Health America, Death Penalty and People with Mental Illness, www.nmha.org/go/position-statements/54. In my view, a consensus is slowly growing to stop executing persons with severe mental illness. But excluding the severely mentally ill from death row involves a more complicated analysis. Juveniles and persons with mental retardation can be identified by a number, either an age or an IQ score and recognized factors. As I noted in my concurrence in *Ketterer*, "mental illness is not as easily quantified as mental retardation. Mental retardation is a fixed condition with more objective symptoms. Mental illness is a much broader category, with wide ranges of diagnoses and periods of decompensation and remission. Treatment options vary widely, including counseling, behavior modifications, group therapy, and medication. Some treatments and medications are controversial as to effectiveness and side effects. Mental illness as a defense is a difficult issue to quantify in a court of law. * * * Therefore, while I personally believe that the time has come for our society to add persons with severe mental illness to the category of those excluded from application of the death penalty, I believe that the line should be drawn by the General Assembly, not by a court. * * * [N]othing prevents the legislature from examining and using those * * * evolving standards [of decency]. In fact, it is the legislature's role to do so. Therefore, I urge our General Assembly to consider legislation setting the criteria for determining when a person with a severe mental illness should be excluded from the penalty of death. Unlike mental retardation, which can be determined by a number on an IQ test and other basic criteria, mental illnesses vary widely in severity. The General Assembly would be the proper body to examine these variations, take public testimony, hear from experts in the field, and fashion criteria for the judicial system to apply." *Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 247-248 (Lundberg Stratton, J., concurring).

**Conclusion**

**{¶ 366}** " 'A society that denies mental health care to those who need it the most and then subsequently executes them is cruel and inhumane at its very core. All of us need to be asking: "Is this the kind of society that we envision for ourselves?" My answer is that we can and must do better.' " Sue Gunawardena-Vaughn, Director of Amnesty International USA's Program to Abolish the Death Penalty, quoted in Malone, Cruel and Inhumane: Executing the Mentally Ill, Amnesty International Magazine, http://www.amnestyusa.org/node/87240.

**{¶ 367}** For these reasons, as well as those expressed in my concurrence in *Ketterer*, I reluctantly concur in the majority decision today, but I continue to fervently urge our General Assembly to take up the critical issue of whether, and/or under what circumstances, this state should continue to execute persons with varying degrees of mental illness.

PFEIFER and MCGEE BROWN, JJ., concur in the foregoing opinion.

_____

John D. Ferrero Jr., Stark County Prosecuting Attorney, and Ronald Mark Caldwell and Kathleen O. Tatarsky, Assistant Prosecuting Attorneys, for appellee.

Timothy Young, Ohio Public Defender, Joseph E. Wilhelm, Chief Counsel, Death Penalty Division, and Benjamin D. Zober, Jennifer A. Prillo, and Rachel Troutman, Assistant Public Defenders, for appellant.

_____